# Illinois Official Reports

## Appellate Court

---

### *Franko v. Police Board of Chicago*, 2021 IL App (1st) 201362

---

| | |
|---|---|
| Appellate Court Caption | STEPHEN FRANKO, Plaintiff-Appellant, v. THE POLICE BOARD OF THE CITY OF CHICAGO and DAVID O. BROWN, Superintendent of Police, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>No. 1-20-1362 |
| Filed | November 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-CH-9205; the Hon. Celia Gamrath, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Donna M. Dowd, of Chicago, for appellant.<br><br>Celia Meza, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Ellen Wight McLaughlin, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellees. |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion.<br>Justices Lampkin and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    On August 30, 2016, the superintendent of police (Superintendent) brought charges before the Police Board of the City of Chicago (Police Board) against plaintiff, Sergeant Stephen Franko, seeking his termination from the Chicago Police Department (CPD) for violations of several rules of conduct stemming from the October 20, 2014, shooting of Laquan McDonald by Officer Jason Van Dyke. The charges arose from plaintiff's approval of allegedly false reports prepared by subordinate officers about McDonald's shooting and the failure to ensure that his subordinate officers' in-car audio systems were operational. After a three-day hearing, the Police Board found plaintiff guilty of all charges and discharged him. On administrative review, the circuit court affirmed. Plaintiff appeals, contending that (1) the Police Board erred by consolidating his case with three other police officers who were at the scene of McDonald's shooting, (2) the Police Board erred by staying its proceedings against him until the completion of the criminal trial against Van Dyke, and (3) the Police Board's findings that he violated CPD rules were against the manifest weight of the evidence and its decision to discharge him was without cause. We affirm.

¶ 2    On October 20, 2014, plaintiff was a field sergeant whose responsibilities included monitoring the officers assigned to him and approving their reports. Officers Dora Fontaine, Janet Mondragon, Daphne Sebastian, Joseph McElligot, Thomas Gaffney, and Ricardo Viramontes were under plaintiff's supervision that night. According to McElligot, he and Gaffney responded to a 911 call and saw McDonald, armed with a knife and walking around near the 4100 block of Kildare Avenue. McDonald stabbed their car tire and scratched their car window with the knife and ran away. Plaintiff heard a CPD dispatch stating that McElligot and Gaffney were requesting a Taser. Driving to the location, plaintiff heard a transmission about shots fired. Before plaintiff arrived at the scene, Van Dyke fired 16 shots at McDonald and killed him.

¶ 3    Plaintiff went to work securing the scene after the shooting. He spoke to Van Dyke and his partner, Officer Joseph Walsh, then drove them to the police station so they could complete and submit reports related to the shooting. Van Dyke and Walsh each completed a tactical response report (TRR) and an officer's battery report (OBR) indicating that McDonald had attacked and battered them both prior to the shooting. Specifically, both officers checked boxes on the TRRs stating that McDonald had posed an "imminent threat of battery," "attacked with [a] weapon," and used "force likely to cause death or great bodily harm." They each checked a box on the respective OBRs describing the "manner of attack" as "stabbed, cut" and stated that three officers had been battered in total (although they never specifically identified the third officer allegedly attacked and battered). In addition, Fontaine prepared a case incident report that listed Van Dyke, Walsh, and Gaffney as "victims" and stated that Van Dyke was "injured." Plaintiff signed all five reports prepared by Van Dyke, Walsh, and Fontaine and submitted them to the on-call incident commander (OCIC), Deputy Chief David McNaughton, for review.

¶ 4    The CPD's Bureau of Internal Affairs began an investigation into the shooting but the Superintendent referred the matter to the Office of the Inspector General (OIG).

¶ 5    Viramontes, Mondragon, and Sebastian, who were all at the scene of the shooting, made statements. Viramontes stated that immediately prior to the shooting, McDonald turned toward

Van Dyke and Walsh. After McDonald was shot, he fell to the ground but then attempted to get back up with the knife in his hand.

¶ 6    Mondragon stated that she and her partner, Sebastian, arrived at the scene after receiving a radio call and saw McDonald running southbound on Pulaski while waving a knife. Mondragon heard Van Dyke and Walsh order McDonald to drop the knife. Mondragon then looked down while placing her vehicle transmission into park and heard multiple gunshots, but she did not see who fired the shots.

¶ 7    Sebastian stated that after arriving at the scene, she saw McDonald running down Pulaski Road while waving a knife. Van Dyke and Walsh pulled ahead of McDonald, exited their vehicle with guns drawn, and ordered McDonald to drop the knife. McDonald ignored their command and advanced toward the two officers while continuing to wave the knife. Sebastian heard multiple gun shots and saw McDonald fall to the ground.

¶ 8    During the investigation of the incident, the CPD recovered a dashcam video of the shooting from Mondragon and Sebastian's police car. The dashcam video did not contain any audio recordings. However, the video showed that at the time of the shooting, McDonald was moving away from the officers and was not waving the knife at them, contrary to the statements in the TRRs and OBRs made by Van Dyke and Walsh and signed off on by plaintiff, which indicated that McDonald had posed an imminent threat of battery likely to cause death or great bodily harm and had stabbed and cut the officers. The video also contradicted the case incident report prepared by Fontaine and signed off by plaintiff indicating that Van Dyke, Walsh, and Gaffney were victims of McDonald's attack and that Van Dyke was injured by McDonald. The video contradicted Viramontes's statement that McDonald turned toward the officers prior to the shooting and that he attempted to get up after the shooting, and it also contradicted Sebastian's statement that McDonald advanced toward the officers while waving the knife. Finally, the video showed that Mondragon's police car was moving for the first four seconds of the shooting, contradicting her statement that she was putting the car into park during that time frame and was unable to see the shooting.

¶ 9    On August 30, 2016, the Superintendent brought charges before the Police Board against plaintiff, Van Dyke, Walsh, Mondragon, Sebastian, and Viramontes, recommending that all six officers be discharged.[1] With respect to plaintiff, the Superintendent alleged that he had a duty to ensure the accuracy of the police reports made by the officers assigned to him and that he approved false, misleading, or inaccurate statements in Fontaine's case incident report and in the TRRs and OBRs prepared by Van Dyke and Walsh. The Superintendent further alleged that plaintiff failed to monitor his subordinates to ensure they maintained a practice of using audio in the in-car video systems, failed to ensure that the audio was operational, and did not maintain an accurate log of the status of the in-car systems.

¶ 10   The Superintendent charged that plaintiff's approval of the false statements made by Van Dyke and Walsh in the TRRs and OBRs violated several CPD Rules of Conduct, specifically: Rule 2, which prohibits conduct that "impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department"; Rule 3, which prohibits "[a]ny failure to promote the Department's efforts to implement its policy or accomplish its goals"; and Rule 14, which prohibits making "a false report, written or oral." The Superintendent charged that

---

[1]After Van Dyke's conviction, the hearing officer subsequently severed his case. Walsh resigned from the CPD.

plaintiff's approval of the false statements made by Fontaine in the case incident report also violated Rules 2 and 3 (but not Rule 14). The Superintendent charged that plaintiff's failure to supervise the use of the in-car audio systems violated Rules 2 and 3, as well as Rule 6, which prohibits "[d]isobedience of an order or directive," and Rule 11, which prohibits "[i]ncompetency or inefficiency in the performance of duty."

¶ 11    The Superintendent also charged Viramontes, Sebastian, and Mondragon with violations of Rules 2, 3, and 14 for making false statements about Van Dyke's shooting of McDonald. Sebastian and Mondragon were additionally charged with violating Rules 2, 3, 6, and 11 in connection with their failures to use the in-car audio system on the night of the shooting.

¶ 12    On September 1, 2016, plaintiff was served with a suspension notification, informing him that he would be suspended without pay for 30 days for the rules violations pending a separation hearing.

¶ 13    Without objection, the assigned hearing officer consolidated the cases against plaintiff, Van Dyke, Mondragon, Sebastian, and Viramontes for discovery and motion practice. The parties proceeded to engage in discovery, exchanging thousands of pages of documents in preparation for the hearing. On December 16, 2016, Joseph H. McMahon, the special prosecutor appointed to prosecute Van Dyke, moved for a stay of the Police Board proceedings until the completion of Van Dyke's criminal trial. McMahon explained that, as a prosecutor, he has "a duty to prevent those who are not under the direct supervision of the prosecutor from making extrajudicial comments that pose a serious or immense threat of heightening public condemnation of [Van Dyke]." McMahon further stated that reports of the Police Board proceedings could make Van Dyke's statements public and that the judge presiding over Van Dyke's criminal trial had issued a "decorum order" prohibiting the parties from releasing any extrajudicial statement of Van Dyke or any witness relating to the criminal case.

¶ 14    On January 5, 2017, Patricia Brown Holmes, the special prosecutor appointed to investigate whether charges should be filed against any other CPD personnel in connection with the McDonald shooting, moved to join the request for a temporary stay of the Police Board proceedings until the outcome of the ongoing criminal proceedings. Holmes explained that in *Garrity v. New Jersey*, 385 U.S. 493 (1967), the United States Supreme Court held that the fourteenth amendment prohibits the use in criminal proceedings of coerced statements obtained from officers under the threat of removal from office. Holmes argued that "a stay was critical to protecting the constitutional rights of the officers involved, and particularly their right not to have statements they made to investigators, on pain of their discharge *** publicized in connection with the Police Board proceedings." Such statements "are inadmissible in criminal court under *Garrity*" and, "in her criminal prosecution, [they] cannot be used, nor can information garnered from the coerced statements be used against the officers."

¶ 15    On May 3, 2017, McMahon withdrew his motion for a stay of the Police Board proceedings, but at a hearing held on May 16, 2017, Holmes stated that she was still seeking a stay. On May 17, 2017, Van Dyke filed his own motion for a stay, arguing that "the publication of *Garrity*-protected statements, which the Superintendent intends to use as evidence in the Police Board cases, would pose a serious or imminent threat of further public condemnation in his case and prejudice him in his upcoming criminal trial."

¶ 16    The Police Board granted the motions for a stay on June 12, 2017, explaining that the Superintendent would "rely extensively on the *Garrity*-protected and coerced statements of all five of the respondents" and that prosecutors, grand jurors, regular jurors, and/or witnesses in

- 4 -

the criminal case against Van Dyke would likely be exposed to those *Garrity*-protected statements through the media. The Police Board reasoned that "if a prosecutor, grand juror, jury member, or witness is exposed to the contents of a *Garrity*-protected statement, through the media or otherwise, the police officer's criminal case [may] be tainted and the charges against him *** dismissed." The Police Board concluded that it would be a "disservice" to go forward with "the Police Board discharge cases" because doing so might "prejudice or jeopardize" the criminal case against Van Dyke and any related cases the special prosecutor might bring.

¶ 17 The Police Board further recognized that "an administrative agency may not indefinitely postpone its adjudication of cases" where a legitimate property interest is at stake without offending due process. Because Illinois law provides that Chicago police officers cannot be discharged except for cause, all the charged officers had a property interest in their jobs, which interest was harmed by the postponement of the hearings as well as their ongoing suspensions without pay. Accordingly, the Police Board vacated the hearing officer's determination that the officers' cases warranted extended suspensions of longer than 30 days and restored plaintiff to active duty with pay on June 16, 2017, pending resolution of the hearing. However, plaintiff did not receive back pay for the nine months he was suspended prior to his reinstatement.

¶ 18 Meanwhile, in the criminal case, Van Dyke was found guilty of second degree murder and 16 counts of aggravated battery with a firearm on October 5, 2018. On October 10, 2018, the Superintendent moved to vacate the stay of the Police Board proceedings, explaining that such proceedings would no longer prejudice any criminal case because Van Dyke had been found guilty and no criminal charges had been brought against plaintiff or the other respondents. The Police Board vacated the stay on November 29, 2018.

¶ 19 In a prehearing order, the hearing officer determined that plaintiff's case should be consolidated with Mondragon's, Sebastian's, and Viramontes's cases for hearing. He reasoned that the charges against all four respondents arose out of the McDonald shooting and that there was extensive overlap in witnesses and exhibits.

¶ 20 At the hearing, the Superintendent presented evidence about the five reports that plaintiff approved after the shooting, namely, the TRRs and OBRs prepared by Van Dyke and Walsh and the original case incident report prepared by Fontaine.

¶ 21 Sergeant Larry Snelling testified that the purpose of a TRR "is to accurately document the officer's response to a subject's actions." CPD General Order G03-02-05, titled "Incidents Requiring The Completion Of A Tactical Response Report," states that a TRR "will be used" to document "all incidents which involve a subject fitting the definition of an assailant whose actions are directed against a Department member or directed against another person and the member intervenes." CPD General Order G03-02-02, titled "Force Options," states that an "assailant" is "a subject who is using or threatening the imminent use of force against himself/herself or another person." Assailants are further divided into three categories, based on whether their actions are "aggressively offensive without weapons," "will likely cause physical injury," or "will likely cause death or serious physical injury." Under the CPD General Order G03-02-02, firearms and other deadly force are appropriate only when "dealing with an assailant whose actions will likely cause death or serious physical injury to another."

¶ 22 Snelling testified that if an officer is battered or assaulted, he also completes an OBR. CPD Special Order S04-13-01, titled "Officer's Battery Reporting Procedures," requires an OBR

when "a sworn member is the victim of *** battery, aggravated assault, or assault while performing a police function either on-duty or off-duty."

¶ 23    Snelling testified that field sergeants review TRRs and OBRs and check them for "accuracy and completeness," and then they are forwarded on for further review by the lieutenant and the deputy chief. The sergeant's responsibility for initially reviewing the TRRs and OBRs for accuracy and completeness is set out in several CPD orders. CPD Special Order S03-02-04, titled "Clear Automated Tactical Response Report," states that a "field supervisor will *** review any submitted A-TRRs, ensuring completeness and accuracy." CPD Special Order 03-03-06, titled "District Field Sergeants," states that "Field sergeants will ensure TRRs are properly completed and forwarded for approval."

¶ 24    Plaintiff approved the TRRs and OBRs prepared by Van Dyke and Walsh, as well as the initial case incident report prepared by Fontaine. Tina Skahill, commander/director of the Bureau of Internal Affairs, testified that the initial case incident report is used to document the preliminary incident investigation. The supervising sergeant's signature on the case incident report signifies that he read the report and ensured its accuracy and completeness. If the sergeant becomes aware of evidence demonstrating that the case incident report is inaccurate, his responsibility is to "address the issue with the individual who wrote the report and investigate the discrepancies." The sergeant may not ignore evidence disproving the report. For example, Skahill testified that the sergeant would have a duty to investigate further if the case incident report stated that an officer was injured even though the officer told the sergeant that he was uninjured. Also, if the sergeant had access to a videotape depicting the incident, he has an obligation to review that video before signing off on the case incident report.

¶ 25    Skahill further testified that when a sergeant reviews a report, whether a TRR, OBR, or case incident report, he has "a duty to ensure as much as [he] can whether or not the information contained in the report is accurate. [He] may not put [his] head in the sand and say [he] won't look at anything other than whether a box is filled in and whether [he] can read it. [He] must assess the information."

¶ 26    Plaintiff testified, contrary to Skahill, that he only reviewed the TRRs and OBRs for "legibility and completeness" to ensure that they were completed as the instructions indicated and to verify that the necessary boxes were checked off, but he did not check their accuracy or approve them; instead, after signing off on their legibility and completeness, he sent the TRRs and OBRs to the OCIC, McNaughton, for his approval.

¶ 27    The Superintendent presented evidence that plaintiff knew or should have known that the TRRs, OBRs, and case incident report he signed contained false information. The first inaccuracy was that the case incident report stated that Van Dyke was "injured by offender," when he was not. Skahill explained that such a "major discrepancy" was "apparent in the reports" because the "original case report *** noted an injury to the officer, but on the OBR, it said no injury." Plaintiff also testified that when he talked with Van Dyke and Walsh at the scene, he asked if they were "okay" and both officers said yes. Van Dyke did not verbally complain to plaintiff that he had been physically injured, did not make any claims of being injured at all, and was not bleeding anywhere. Plaintiff drove Van Dyke to the police station, and during the ride, he appeared uninjured. Van Dyke also did not fill out an "Injury on Duty" report, which was a required first step for seeking medical follow-up for an injury.

¶ 28    Van Dyke's and Walsh's TRRs also inaccurately checked off boxes stating that McDonald was an "assailant" who attacked with a weapon and assaulted them with "force likely to cause

- 6 -

death or great bodily harm." Van Dyke and Walsh each filled out an OBR inaccurately stating that McDonald had battered them (and had also battered an additional unidentified officer) and that the manner of attack was "stabbed/cut." Snelling testified that a reasonable officer would *not* have checked the "Assailant Assault box" because after viewing the dashcam video, "the only thing that [one] can see here is [McDonald] walking, the officers exit their vehicle, and it appears that [McDonald] is walking on an angle away from the officers, and at some point [Van Dyke] discharges his weapon, [McDonald] spins and hits the ground." In Snelling's view, there was nothing "that could remotely be interpreted as [McDonald] committing a battery on this video." Snelling further testified:

> "Q. Why don't [McDonald's] actions continuing to walk with his knife in his hand make him an assailant?
>
> A. Because *** a subject becomes an assailant when that subject commits an act of furtherance other than just being armed. Police officers come in contact with people who are armed all the time. There are three components you need for a deadly threat. The weapon system, delivery system, and intent. So *** when you look at this video and you see the weapon system, you see the delivery system, obviously the question here would be the intent. If there was a movement in furtherance toward the officer that you could actually see in the video, then it would rise to the level of deadly force, but I can't see it in the video."

¶ 29 Plaintiff testified that after returning to the police station following the shooting, the dashcam video was being viewed by detectives on a laptop computer but he only watched "bits and pieces" of it because he did not "enjoy watching people be shot." Plaintiff admitted that in the portion of the video that he viewed, he did not see McDonald commit a battery nor did he see McDonald use any force that could have caused death or great bodily harm to Van Dyke.

¶ 30 In addition to the evidence that plaintiff signed off on inaccurate reports falsely indicating that McDonald had battered the officers and threatened deadly force, the Superintendent also presented evidence of plaintiff's failure to ensure that his subordinates' in-car audio systems were operational.

¶ 31 Plaintiff testified that, in October 2014, CPD patrol cars were equipped with dashboard-mounted video cameras. Each patrol officer was assigned a microphone that linked to the in-car video system. The in-car video system automatically engaged audio and video recording when the car's emergency roof lights were activated. Retired Sergeant Lance Becvar, who "headed up the squad that monitored the in-car cameras' day-to-day operations," testified that when the officers entered their squad cars, they were supposed to check that the in-car video system was working and "put the microphones on their person." CPD Special Order S03-05, titled "In-Car Video Systems," states that "at the beginning of a tour of duty," officers are to ensure the audio recorder is "securely attached to the member's person."

¶ 32 CPD Special Order S03-03-03, "District Field Sergeants," states that field sergeants are required to "monitor subordinates to ensure the in-car video system is used properly, including *** verifying that the in-car video systems, including microphones, are operational and subordinates are logged into the system." CPD Special Order S03-05 states that the sergeant assigned to supervise department members using department vehicles equipped with an in-car video system is required to "monitor subordinates to ensure the in-car video system is used" and "document on the Supervisor's Management Log *** whether each vehicle has an in-car video system and if it is functioning."

¶ 33     On his supervisor's management log for the night before the shooting, plaintiff did not check the boxes indicating whether the in-car camera system was operable for the vehicles used by Sebastian, Mondragon, Viramontes, and Fontaine. Plaintiff testified that he sent Sebastian and Mondragon messages over the portable data terminal system asking for the status of their camera system, which included the audio and visual capabilities. Sebastian testified that plaintiff never specifically asked her about the status of the microphone in her squad car and she did not check to ensure that it was working, nor did she attach it to her body. Mondragon similarly testified that she did not attach the microphone to her body.

¶ 34     Becvar testified that he checked the squad cars for video after the McDonald shooting and did not recover any audio recordings. Mondragon's and Sebastian's microphones were in the glove box, and the microphone batteries were installed upside down.

¶ 35     Following all the evidence, the Police Board issued a decision finding plaintiff guilty of all the charges against him. The Police Board noted that as the first on-scene supervisor at the scene of the shooting, plaintiff was tasked with "reviewing and approving the critical case reports" and he "had a duty *** not merely to sign the reports, but to determine if these reports were complete and accurate before signing them." He "failed to do so and thus violated his duties" because the reports he approved "contained several demonstrable and known falsehoods, including *** that Officer Van Dyke was injured by Laquan McDonald, that Officers Van Dyke and Walsh were victims, and that Mr. McDonald assaulted and committed battery against them by attacking them with a weapon, using force likely to cause death or great bodily harm."

¶ 36     The Police Board found that plaintiff's testimony that he did not watch the entirety of the dashcam video "incredible" because it was "the key piece of contemporaneous evidence as to what had happened" and was available to plaintiff "for hours." Plaintiff had "an obligation to view the video in order to determine if the accounts given by Officers Van Dyke and Walsh were complete and accurate." He could not "put his head in the sand." Therefore, when plaintiff approved the TRRs, OBRs, and case incident report, he should have known everything contained in the video.

¶ 37     The Police Board rejected plaintiff's argument that he was only required to review the TRRs and OBRs for "legibility" and to ensure that all the boxes on the forms were completed but that he had no responsibility to approve them for accuracy. The Police Board found that plaintiff's "decision to sign off on reports he knew were false represents a major and serious failure of leadership" and constituted a violation of CPD Rules 2, 3, and 14.

¶ 38     The Police Board also found plaintiff guilty of violating CPD Rules 2, 3, 6, and 11 by failing to ensure that his subordinates were using the audio component of the in-car video systems.

¶ 39     The Police Board discharged plaintiff. The Police Board also discharged Viramontes, Mondragon, and Sebastian, finding that Viramontes and Mondragon violated CPD Rules 2, 3, and 14, and that Sebastian violated Rules 2 and 3 for making false statements to detectives regarding the shooting. Mondragon and Sebastian were each found guilty of violating Rules 2, 3, 6, and 11 for failing to inspect the in-car video system and attach the audio recorder to their person and audibly record McDonald's shooting.

¶ 40     Plaintiff filed a complaint for administrative review in the circuit court, arguing that the hearing officer's decision to consolidate his case with those of Viramontes, Mondragon, and Sebastian was an abuse of discretion. Plaintiff also argued that the Police Board's findings

- 8 -

against him were against the manifest weight of the evidence and that its decision to terminate him was clearly erroneous.

¶ 41    The circuit court affirmed the Police Board. Plaintiff appeals.

¶ 42    As the reviewing court, we review the decision of the Police Board, not the circuit court. *Krocka v. Police Board of Chicago*, 327 Ill. App. 3d 36, 46 (2001). We apply a two-step analysis for reviewing the Police Board's discharge decision. *Id.* First, we determine whether the Police Board's findings are against the manifest weight of the evidence (*id.*), meaning that the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). If the record contains evidence supporting the Police Board's findings, they should be affirmed. *Id.*

¶ 43    Second, we determine whether the findings of fact provide a sufficient basis for the Police Board's conclusion that cause for discharge exists. *Krocka*, 327 Ill. App. 3d at 46. We will not reverse the Police Board's decision as to cause unless it was arbitrary, unreasonable, or unrelated to the requirements of service. *Id.*

¶ 44    Plaintiff contends that it was against the manifest weight of the evidence for the Police Board to find that he violated CPD Rules 2, 3, and 14 by signing off on the false statements in the TRRs and OBRs prepared by Van Dyke and Walsh regarding how McDonald attacked each of them (plus a third unidentified officer) with a weapon and stabbed/cut them while using force likely to cause death or great bodily harm. Plaintiff also argues that it was against the manifest weight of the evidence for the Police Board to find that he violated Rules 2 and 3 by signing off on the false statement in the case incident report prepared by Fontaine regarding how McDonald victimized Van Dyke, Walsh, and Gaffney and injured Van Dyke. Plaintiff argues that he was not present at or near the time of the shooting and therefore he properly relied on Van Dyke's, Walsh's, and Fontaine's statements recounting McDonald's conduct just prior to the shooting. To his knowledge at that time, their statements were accurate and complete when he signed off on them and he was not willfully or materially intending to approve false reports. Plaintiff also argues that he did not view the portions of the dashcam video refuting Van Dyke's, Walsh's, and Fontaine's accounts of McDonald's aggressive and threatening behavior just prior to the shooting as he was not required to review "every piece of evidence available" before approving their reports. Plaintiff contends that his role was simply to forward Van Dyke's, Walsh's, and Fontaine's reports on to the OCIC, McNaughton, who would then complete the investigation.

¶ 45    The evidence at the hearing belies plaintiff's arguments. Snelling testified that the field sergeant is the first line of review of a TRR or OBR and his job is to check them for "accuracy and completeness" *before* forwarding them on to his supervisors for further review. The sergeant's responsibility for initially reviewing the TRRs and OBRs for accuracy and completeness is further set out in CPD Special Orders S03-02-04 and S03-03-06. Skahill testified that the sergeant must also review the initial case incident report for accuracy and completeness and may not ignore evidence disproving the report.

¶ 46    In the present case, the dashcam video showing McDonald walking away from the officers was evidence that disproved Van Dyke's and Walsh's statements in their TRRs and OBRs regarding how McDonald threatened and attacked them just prior to the shooting and it also refuted Fontaine's statement in her case incident report that McDonald victimized Van Dyke, Walsh, and Gaffney and injured Van Dyke. Plaintiff claimed that he only watched "bits and pieces" of the video prior to approving the officers' reports but the Police Board found

plaintiff's testimony "incredible" given his access to the video and the fact that it was the "key piece of contemporaneous evidence" regarding the circumstances surrounding the shooting. We may not substitute our judgment for the Police Board's credibility determinations. See *Caliendo v. Martin*, 250 Ill. App. 3d 409, 416 (1993) ("The weight to be given to the evidence and the credibility of witnesses is within the province of the Board.").

¶ 47     In any event, Skahill testified that plaintiff may not "put his head in the sand" and simply ignore the dashcam video; he had a duty to review the video before signing off on the TRRs, OBRs, and case incident report. Therefore, plaintiff should have known everything contained in the video, meaning that he should have known that the TRRs and OBRs prepared by Van Dyke and Walsh, and the case incident report prepared by Fontaine, contained materially false information regarding how McDonald presented a threat of deadly force and assaulted and battered the officers and injured Van Dyke prior to the shooting. Plaintiff signed off on them anyway.

¶ 48     In addition to the dashcam video, there was further evidence belying Fontaine's statement in the case incident report that McDonald injured Van Dyke. Specifically, Van Dyke and Walsh each stated in their OBR that there was no injury, plaintiff asked Van Dyke and Walsh at the scene if they were "okay" and both officers said yes, and Van Dyke never made any claims of being injured and did not fill out an "Injury on Duty" report. Skahill testified that plaintiff had the duty to investigate the discrepancy between the case incident report stating that Van Dyke was injured and all the other evidence showing that he was uninjured, but plaintiff failed to do so and instead signed off on the case incident report.

¶ 49     All this evidence shows that plaintiff disregarded his duty to ensure the accuracy of the TRRs and OBRs prepared by Van Dyke and Walsh and the case incident report prepared by Fontaine. Plaintiff signed off on all these reports while knowing they contained materially false statements about the circumstances leading to the shooting, or he at least should have known that they contained such materially false statements. Accordingly, it was not against the manifest weight of the evidence for the Police Board to find that plaintiff's approval of the false statements in the TRRs and OBRs prepared by Van Dyke and Walsh violated Rule 2's prohibition on conduct impeding the CPD's efforts to achieve its policy and goals or discrediting the CPD, Rule 3's prohibition on any failure to promote the CPD's efforts to implement its policy and goals, and Rule 14's prohibition against making a false report. It was also not against the manifest weight of the evidence for the Board to find that plaintiff violated Rules 2 and 3 by approving the false statement in Fontaine's case incident report regarding how McDonald victimized Van Dyke, Walsh, and Gaffney and injured Van Dyke.

¶ 50     Plaintiff makes no argument that the Police Board erred by finding he violated Rules 2, 3, 6, and 11 by failing to ensure that his subordinates were using the audio component of the in-car video systems and forfeited review thereof. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 51     Next, plaintiff argues that the Police Board did not have cause to discharge him. An officer may not be discharged without cause. 65 ILCS 5/10-1-18.1 (West 2020). "Cause" for discharge has been defined as " 'some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position.' " *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551 (1981) (quoting *Kreiser v. Police Board of Chicago*, 40 Ill. App. 3d 436, 441 (1976)). Because the Police Board stands in the best position to determine the

- 10 -

effect of the officer's conduct on the Department, we give "heavy deference" to its determination of cause. *Orsa v. Police Board*, 2016 IL App (1st) 121709, ¶ 60. We will not reverse the Police Board's finding of cause unless it is arbitrary, unreasonable, or unrelated to the requirements of service. *Krocka*, 327 Ill. App. 3d at 46.

¶ 52    In assessing the penalty here, the Police Board considered plaintiff's complimentary history, awards, and limited disciplinary record but deemed discharge appropriate because "supervising sergeants must be vigilant in following Departmental rules and policies themselves and in insisting that their subordinate patrol officers do so as well." It explained, "This case presents a glaring example of a sergeant who abdicated his responsibility to lead as a supervisor and failed in his duties as a sworn officer by approving reports of a fatal officer-involved shooting that he knew, or should have known, were false, and in failing to ensure that his officers utilized the Department's audio system." The Police Board found that plaintiff's position at the hearing that he had no obligation to assess the accuracy of the TRRs and OBRs was "particularly troubling."

¶ 53    The Police Board concluded that plaintiff's conduct "brought discredit upon the Chicago Police Department" and undermined its mission. Plaintiff's conduct also fostered "public distrust and a lack of confidence in the integrity of the Chicago Police Department, thereby significantly harming the Department's efforts to achieve the important goals of preventing crime, preserving the public peace, identifying, and arresting those who commit crimes, and promoting respect and cooperation of all Chicagoans for the law and those sworn to enforce it." The Police Board noted that plaintiff's violations of Rules 2 and 3 "are, by themselves, sufficiently serious to warrant his discharge from the Police Department."

¶ 54    We affirm, as the Police Board's finding of cause for discharge was not arbitrary, unreasonable, or unrelated to the requirements of plaintiff's service as a sergeant in the CPD with supervisory responsibilities.

¶ 55    Next, plaintiff argues that the Police Board erred by consolidating his case with those of Viramontes, Sebastian, and Mondragon. Consolidation is appropriate where "the separate causes are of the same nature, arise from the same act, event or transaction, involve the same or like issues, and depend largely or substantially upon the same evidence, and when a joint trial will not give one party an undue advantage or prejudice the substantial rights of any party." *Daniels v. Police Board of Chicago*, 338 Ill. App. 3d 851, 860 (2003). We will not reverse the Police Board's decision to consolidate cases for a hearing absent an abuse of discretion. *Id.*

¶ 56    The Police Board committed no abuse of discretion in consolidating the cases against plaintiff, Viramontes, Sebastian, and Mondragon as they all arose from the same event, Van Dyke's shooting of McDonald. Consolidation was also appropriate because the cases involved like issues and charges and depended largely on the same evidence. Specifically, Viramontes, Sebastian, and Mondragon were charged with making false statements about Van Dyke's shooting of McDonald in violation of Rules 2, 3, and 14, and plaintiff was charged with those same rules violations for approving Van Dyke's, Walsh's, and Fontaine's false statements about the shooting. The evidence in common was the dashcam video showing the falsity of the statements made by Viramontes, Sebastian, Mondragon, Van Dyke, and Walsh.

¶ 57    There was also an overlap of charges and evidence relating to plaintiff's, Sebastian's, and Mondragon's failures with regard to the in-car audio equipment on the night of the shooting that further supports the Police Board's consolidation decision. Specifically, Sebastian and Mondragon were charged with violating Rules 2, 3, 6, and 11 for failing to obtain the audio

recorder from the in-car video system and ensure that it was securely attached to their person; failing to ensure the audio component of the system was working properly; failing to audibly record events with the in-car video system; and failing to notify their supervisor about the audio component's status. Plaintiff was charged with those same rules violations for failing to monitor Sebastian and Mondragon to ensure they maintained a practice of using audio in the in-car video systems; failing to ensure the audio portion of the in-car video systems was used properly and that the in-car microphones were operational; failing to initiate an investigation when notified of damaged or missing audio equipment; and failing to maintain an accurate supervisor's management log indicating whether the in-camera systems were operable. These charges against plaintiff, Sebastian, and Mondragon relating to the in-car audio equipment largely depended on the same evidence, namely: Sebastian's testimony that plaintiff never asked her about the status of the microphones in her squad car and she did not check to see that they were working; Sebastian's and Mondragon's testimony that they did not affix the microphones to their body; and Becvar's testimony that no audio recordings were recovered and that Mondragon's and Sebastian's microphones were in the glove box and the microphone batteries were installed upside down.

¶ 58      Plaintiff argues that his case should not have been consolidated with those of Viramontes, Sebastian, and Mondragon because the case against him featured a unique witness, Skahill, who testified only about his actions on the night of the shooting and not those of the other officers. Plaintiff's argument is without merit as we have held that where cases are consolidated, the Police Board is "presumed to be able to judge each case on the basis of the evidence uniquely applicable to each case." *Id.* at 861. Plaintiff has not overcome this presumption or shown that he was prejudiced in any way by having his case consolidated with Viramontes, Sebastian, and Mondragon. Accordingly, the Police Board committed no abuse of discretion in its decision to consolidate the cases together.

¶ 59      Next, plaintiff argues that the Police Board violated his due process rights by staying his hearing until the conclusion of Van Dyke's criminal trial. Plaintiff forfeited review of this issue by failing to raise it before the circuit court on administrative review. The circuit court's judgment on administrative review indicates that the only due process arguments that plaintiff made were that the charges against him were not precise and that he was not adequately apprised of the charges against him; he did not argue that the Police Board violated his due process rights by staying the hearing until the conclusion of Van Dyke's criminal trial. Accordingly, he may not raise the issue on appeal. See *Messer & Stilp, Ltd. v. Department of Employment Security*, 392 Ill. App. 3d 849, 861 (2009).

¶ 60      Forfeiture aside, the Police Board argues that plaintiff's due process claim is precluded by *res judicata* as the same argument was made and adjudicated by the federal district court in *Policemen's Benevolent & Protective Ass'n of Illinois, Unit 156-Sergeants v. City of Chicago*, No. 17 C 8469, 2020 WL 291371 (N.D. Ill. Jan. 21, 2020). "Under the doctrine of *res judicata*, a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). *Res judicata* applies where "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *Id.*

¶ 61      In *Policemen's Benevolent*, plaintiff and his union filed a federal lawsuit on November 21, 2017, claiming that the City of Chicago violated his due process rights by suspending him from

his job without pay for nine months from September 1, 2016, through June 16, 2017, and for staying his post-suspension hearing until the conclusion of the criminal trial against Van Dyke. The federal district court granted summary judgment for the City (see *Policemen's Benevolent*, 2020 WL 291371), noting that in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546-48 (1985), the Supreme Court held that where a government employer has a strong interest in "quickly removing an unsatisfactory employee," and where substantial "post-termination administrative procedures" are available, the employee may be due no more pretermination process than "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."

¶ 62    The district court found that the process plaintiff received in the course of the investigation by the OIG satisfied *Loudermill*'s requirements for pre-deprivation due process because months before his suspension, plaintiff had received the notice of allegations against him and he had also received copies of the allegedly false police reports and the dashcam video. *Policemen's Benevolent*, 2020 WL 291371, at *6. Plaintiff had also sat down for multiple interviews with an OIG investigator, during which the investigator went through each paragraph of the allegations in detail, giving him an opportunity to respond to each one and to make a statement for the record. *Id.* It was only after these interviews that plaintiff was charged with the rules violations warranting suspension, pending a separation hearing. *Id.* The district court ruled that it was clear from these facts that plaintiff had received notice of the charges against him, an explanation of the City's evidence, and an opportunity to present his side of the story, which was all the due process he was required to receive prior to his suspension. *Id.*

¶ 63    The district court next addressed the delay in the post-suspension hearing, noting that the determination of whether the delay offends due process requires " 'examin[ing] [1] the importance of the private interest and the harm to this interest occasioned by delay; [2] the justification offered by the Government for delay and its relation to the underlying governmental interest; and [3] the likelihood that the interim decision may have been mistaken.' " *Id.* at *7 (quoting *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230, 242 (1988)).

¶ 64    The district court recognized plaintiff's important private interest in his continued employment as a police officer and that the harm to this private interest was at its "most severe" during the nine-month period from September 2016 to June 2017 when he was suspended without pay. *Id.* However, a suspension without pay does not require an immediate post-suspension hearing when an important government interest justifies the suspension and where the Police Board took actions minimizing the risk that the suspension was erroneous. *Id.* at *8. In this case, there was a strong governmental interest in preserving public confidence in the police force by taking appropriately swift and severe disciplinary action, including unpaid suspension, when plaintiff was accused of serious misconduct. *Id.* There was only a slight risk that the suspension was erroneous because the OIG conducted a thorough investigation, including two interviews with plaintiff during which it reviewed the allegations against him and gave him the chance to respond. *Id.* Given the minimal risk that the suspension was erroneous, the district court concluded that the government interest in preserving public confidence in the police force outweighed plaintiff's private interest in his livelihood to justify the nine-month delay in holding his post-suspension hearing while he remained suspended without pay. *Id.*

¶ 65    The district court next considered the alleged due process violation in extending the stay of his post-suspension hearing until the conclusion of the criminal proceedings against Van Dyke. The justification offered for the extended stay, namely, that it would reduce the chance that *Garrity*-protected statements would be released that could jeopardize the criminal case against Van Dyke, was closely connected to the governmental interest in preserving public confidence in its police force. *Id.* The district court noted that the City's lifting of the unpaid suspension in June 2017 removed the obstacle to plaintiff's livelihood during the extended stay in his disciplinary proceedings, which reduced the harm to his private interest, and concluded that the extended delay did not offend due process. *Id.* at *9. Accordingly, the district court granted the City's motion for summary judgment. *Id.* at *10.

¶ 66    Plaintiff did not appeal the district court's ruling.

¶ 67    The Police Board now argues that the district court's summary judgment ruling for the City in *Policemen's Benevolent* acts as a *res judicata* bar to plaintiff's due process claim here.

¶ 68    The first *res judicata* requirement is that there was a final judgment on the merits rendered by a court of competent jurisdiction. A judgment is final if it determines the litigation on the merits, so that, if affirmed, all that remains is to proceed with the execution of the judgment. *Dookeran v. County of Cook*, 2013 IL App (1st) 111095, ¶ 18. For *res judicata* purposes, a judgment is not final until the possibility of appellate review has been exhausted. *Id.*

¶ 69    The district court's summary judgment order for the City in *Policemen's Benevolent* was a final judgment on the merits rendered by a court of competent jurisdiction as it addressed and rejected plaintiff's due process claim and plaintiff did not file an appeal therefrom, so that all that remained was to proceed with execution of the judgment.

¶ 70    The second *res judicata* requirement is that there was an identity of cause of action in the first and second suits. Under the transactional test adopted by the Illinois Supreme Court, the court must determine whether the two actions arose from the same transaction, *i.e.*, from a single group of operative facts. *River Park*, 184 Ill. 2d at 311. Plaintiff's first suit in *Policemen's Benevolent* in 2017 claiming a due process violation and his second suit here also claiming a due process violation both arose from the same group of operative facts (*i.e.*, they both arose out of the stay of the Board proceedings until the conclusion of the criminal trial against Van Dyke). Accordingly, there was an identity of cause of action.

¶ 71    The third and final *res judicata* requirement is that there be an identity of parties or their privies in the first and second suits. That requirement was met here where plaintiff was a party in both suits and where the defendant in *Policemen's Benevolent*, the City, was in privity with the defendants in the present suit, the Police Board and Superintendent, as they all shared the same legal interests in defending the Board's decision to stay the administrative proceedings until the conclusion of Van Dyke's criminal trial. See *Agolf, LLC v. Village of Arlington Heights*, 409 Ill. App. 3d 211, 220 (2011) (privity exists between the party to the prior suit and a nonparty when the party to the prior suit adequately represented the same legal interests of the nonparty).

¶ 72    As all the elements of *res judicata* were met, plaintiff is barred from relitigating his due process claim in this court.

¶ 73    Affirmed.