2025 IL App (1st) 231272-U

SECOND DIVISION
March 25, 2025

No. 1-23-1272

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| SHELDON THRASHER, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | 22 CH 10212 |
| DAVID BROWN, Superintendent of Police of the | ) | |
| City of Chicago, and THE POLICE BOARD OF THE | ) | Honorable |
| CITY OF CHICAGO, | ) | Anna M. Loftus |
| | ) | Judge Presiding |
| Defendants-Appellees. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Police Board's conclusion that petitioner used excessive force was not against manifest weight of evidence. Sanction of dismissal was not unreasonable.

¶ 2    Sheldon Thrasher appeals the decision of the Police Board of the City of Chicago (Board) to dismiss him from service after concluding that he used excessive force in the officer-involved fatal shooting of Maurice Granton. Thrasher argues that the finding of excessive force impermissibly relied on hindsight, violating the principles set forth in *Graham v. Connor*, 490 US 386 (1989). He further claims that, if the finding of excessive force stands, the specific facts

of this case do not warrant outright dismissal. Because the record below supports the Board's conclusion, we have no choice but to affirm.

¶ 3                                  BACKGROUND

¶ 4      At around 7:30 p.m. on June 6, 2018, Chicago Police Department (CPD) Sergeant Curtis Wallace was using a POD (a Police Observation Device) to remotely monitor the area under the Green Line tracks near East 47th Street and South Prairie Avenue. While doing so, he observed several young men, including Granton, bagging and selling marijuana. He radioed a nearby tactical team to meet him at the location; Thrasher was part of that tactical response team. When Sergeant Wallace decided to engage the men, there was no reason to believe that any of them were armed or that this would be anything other than a routine police interaction.

¶ 5      When Sergeant Wallace reached the Green Line, he called to Granton, "Come here, man." Instead, Granton took off running southbound down the alleyway underneath the elevated Green Line tracks. Sergeant Wallace gave chase. A few yards down the alley, Granton turned right—west—and jumped the fence into an abandoned lot to cut across from the alley onto South Prairie Street. Sergeant Wallace had to abandon the chase, as he tore his Achilles tendon trying to follow Granton over the fence.

¶ 6      As Sergeant Wallace was first engaging Granton in the alley, Thrasher was arriving at the scene and saw Sergeant Wallace take off running. Correctly assuming that the sergeant was chasing a suspect, Thrasher decided to run down South Prairie, effectively parallel to Wallace and to Wallace's west, to cut off Granton. So when Granton jumped the fence and ran west through the vacant lot, he was heading in Thrasher's direction.

¶ 7    Granton, as it turned out, was armed. Almost immediately after Granton jumped the fence and ran into the vacant lot, a gunshot rang out. The forensic evidence would later show that Granton had a concealed weapon that discharged while in his pants pocket.

¶ 8    Thrasher heard the gunshot while he was running south on Prairie. He slowed when he heard it, drew his service weapon, and ducked back behind the corner of a building on Prairie. He then poked his head around the corner, looking through a wrought-iron fence that bordered the vacant lot; at that moment, Thrasher testified, he could see Granton holding what Thrasher believed to be a gun. (The evidence would later show that, after the gun went off in his pocket, Granton discarded it some 25 to 30 feet away from the wrought-iron fence.)

¶ 9    Thrasher, believing Granton to still be armed, then moved out from behind the building and saw Granton run toward the wrought-iron fence separating the vacant lot from Prairie Avenue. As he was approaching the fence, Granton was a bit south of Thrasher but relatively close—about ten feet away—and of course they were separated by the wrought-iron fence, with Granton in the vacant lot and Thrasher on the sidewalk on South Prairie.

¶ 10    But Granton was not facing Thrasher. Based on the footage from the body-worn camera (BWC), it would be more accurate to say that Thrasher could view Granton's right profile through the wrought-iron fence. As Granton approached the fence, he was running, his arms pumping as one would expect. He then seemed to wind up, preparing to jump and then jumping onto the fence, with his arms swinging upward and his hands latching onto the fence.

¶ 11    The BWC footage shows that the first shot was fired while Granton was on the fence, trying to clear it, arms over his head and hands clutching the fence. Granton cried out in pain and fell back to the ground, landing on his feet, turned away from Thrasher upon landing. The second

and third shots were fired as Granton's back was turned and he was attempting to run further south (that is, away from Thrasher). Granton would die from a gunshot to the back.

¶ 12     The events we described in the last four paragraphs happened within the span of about four seconds; that is, four seconds elapsed from the time that Granton's gun discharged in his pants pocket to the time that Thrasher's fatal shot was fired.

¶ 13     Exactly 27 seconds after the shooting, Thrasher activated his BWC. We know this because the police department's BWCs are (or at least Thrasher's BWC was) designed to provide video—but not audio—from 30 seconds before an officer activating the camera. So we have three seconds of footage leading up to the shooting, but no audio.

¶ 14     Some three years later, in August 2021, Superintendent Brown filed charges against Thrasher. alleging that during the June 2018 incident, Thrasher (1) used excessive force, (2) failed to timely activate his body camera, and (3) engaged in disrespectful communications with civilians who had gathered after the shooting. Superintendent Brown recommended discharge.

¶ 15     In June 2022, the Board held the hearing on the charges against Thrasher. At the time of the shooting, the CPD's use-of-force policy required that "[a]ll incidents will be resolved with the foremost regard for the preservation of human life and the safety of all persons involved." Before employing force, officers must

> "use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety."

The "use of a firearm must be objectively reasonable, necessary under the circumstances, and proportional to the threat, actions, and level of resistance offered by a subject." Deadly force is

"a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the [officer] or another person."

¶ 16    In explaining his decision to use deadly force, Thrasher admitted that he did not announce his presence and did not warn Granton before firing. Thrasher explained that he did not do those things because he did not believe there was enough time to de-escalate the situation. From Thrasher's perspective, in the span of about four seconds, he heard a gunshot, saw Granton holding a gun, and then saw Granton scaling the fence. Thrasher could not tell whether Granton still had the gun and personally believed Granton was an imminent threat. Thrasher summarized his decision like this:

> "My thing is he was closer than before and I still thought he had a gun on him. Am I supposed to wait to get shot and see? Or was I supposed to just reassess and wait? This could be me you guys are talking about. I could be laying there. At the end of the day, last time I saw him, he had a gun in his hand. When I saw him again, he was right up on me. What was I supposed to do? I'm supposed to wait and see what's [*sic*] going to do?"

¶ 17    The lynchpin of the Superintendent's case was that Thrasher did not check to confirm that Granton was armed before shooting him. In support, he called an eyewitness, Calvin Alexander. Alexander witnessed the shooting from the corner of 47th and Prairie. He confirmed that Thrasher did not say anything or give any warnings before firing. He also testified that he could clearly see Granton's hands. According to Alexander, Granton was very obviously using both hands to grip the wrought-iron fence and was not holding anything.

¶ 18    Each side identified a use-of-force expert. The Superintendent called Michaelo Gennaco, who opined that the shooting was unjustified. Gennaco focused on the fact that Thrasher entirely failed to implement de-escalation techniques or attempt to determine whether Granton was a true

threat. Gennaco acknowledged that this was a dangerous situation—he did not claim there was *no* threat—but the "critical" question, in his view, was whether Granton was armed; as he put it, whether or not Granton had a gun would "change entirely the calculus here." He found it "alarming" that Thrasher would not focus on Granton's hands when he believed there was a gun at play.

¶ 19     Thrasher's expert was John Farrell, who was a Fraternal Order of Police (FOP) representative and served as Thrasher's FOP representative regarding this shooting. Farrell took a different approach. While he recognized that Thrasher did not employ techniques mandated by CPD policy, he believed the shooting was justified given the information available to Thrasher in the moment. It would have been objectively reasonable, in his view, to believe that Granton had fired a shot *at* the police. In fact, he said, it would have been *un*reasonable for Thrasher to assume that the gunshot came from Granton's pocket as a seemingly accidental discharge.

¶ 20     Farrell noted that it was mere seconds between Granton's gunshot and Thrasher's use of deadly force. He also emphasized that Thrasher did not testify that he *didn't* see a gun in Granton's hand but, rather, that he *couldn't* see Granton's hands. This, in Farrell's view, was a striking difference; Thrasher could have reasonably assumed that Granton was still armed at the time he scaled the fence. Ultimately, because this was, by necessity, a snap judgment, and because Granton had introduced a weapon, Thrasher's use of force was justified.

¶ 21     At the close of evidence, the hearing officer prepared a report in which she identified three "disputed facts." The first was whether Thrasher saw Granton with a gun while in the vacant lot, though she acknowledged that the "evidence indicates that [Thrasher] knew a gun was present" due to the gunshot fired. The second factual dispute concerned whether Thrasher saw Granton drop the gun before the shooting. The third, and most important for the Superintendent's

case, was whether Thrasher "could see Granton's hands—and that Granton was not carrying a gun—at the time [Thrasher] fired."

¶ 22    In a unanimous decision, the Board found Thrasher guilty of using excessive force and failing to timely activate his body camera. (It found him not guilty of inappropriate conduct toward the crowd that gathered after the shooting.) As to the excessive-force charge, the only charge at issue here on appeal, the Board found that

"at the time Mr. Granton was shot, Mr. Granton did not pose an imminent threat to anyone. Mr. Granton was unarmed and his firearm was approximately 25 feet behind him. Mr. Granton's hands were both above his head gripping a fence and his back was partially turned towards [Thrasher]. Mr. Granton's sole focus was on the 6'3" fence that Mr. Granton was attempting to climb. The Board finds, after carefuly reviewing the video, that at no point did Mr. Granton make any threatening moves towards [Thrasher] (or anyone else). To the contrary, Mr. Granton was obviously trying to avoid any interaction with the police.

[Thrasher] knew that Mr. Granton was trying to escape from police. [He] also knew that there was a tall fence separating [himself] from Mr. Granton. Still, contrary to training and appropriate practices, [Thrasher] chose to close the distance between himself and Mr. Granton. [Thrasher] further chose to fire upon Mr. Granton almost immediately upon seeing [him], without first assessing where [his] hands were or what was in them. At no point did [Thrasher] announce his office or tell Mr. Granton to stop or put his hands up. Far from using deadly force as a last resort, [Thrasher] used deadly force instead of attempting anything else."

¶ 23    Though the Board "credited" Thrasher's testimony that he saw Granton with a gun and never saw him drop it, they "believe[d] that a reasonable officer would have been laser focused on Mr. Granton's hands and trying to determine whether those hands could possibly be carrying a weapon." The Board believed the testimony of Alexander, the eyewitness, that it was obvious that Granton wasn't carrying a weapon as he was using both hands to grip the fence.

¶ 24    The Board concluded its findings by noting that "[a]s a trained police officer, [Thrasher's] powers of observation should have been at least as effective as that civilian bystander's. If [Thrasher] had taken even a moment to assess the circumstances he was facing, he would have concluded that Mr. Granton was not an imminent threat. Unfortunately, [Thrasher] did not take that moment to reassess."

¶ 25    As noted, the Board also found Thrasher guilty of failing to timely activate his body camera, specifically questioning why he didn't activate it en route to the scene, when he knew he was going to be engaged in a police interaction. (We need not go into further detail here, as the Board's sanction was based on the finding of excessive force, and Thrasher does not challenge the body-cam violation on appeal.)

¶ 26    As to the discipline, the Board specifically found that Thrasher did not act with bad intent. Instead, it believed that, because the situation escalated so quickly, "he was both shocked and scared when he heard a weapon discharge." It was this "fear—not a desire to do harm—that caused him to panic and shoot when it was not necessary to do so."

¶ 27    Still, the Board believed that his failure to follow training in a stressful situation "indicate[d] a gross disregard for the safety of the members of the public, and a lack of judgment so serious as to warrant his discharge from the Chicago Police Department." In the Board's view,

returning Thrasher to duty, where he would again be authorized to use deadly force, "poses an unacceptable risk to the safety of the public and Chicago police officers."

¶ 28    Thrasher filed a petition for administrative review in the circuit court. The circuit court affirmed the decision of the Board. This appeal followed.

¶ 29                                  ANALYSIS

¶ 30    Thrasher asks us to reverse the Board's finding that he used excessive force. In the alternative, he claims that, even if we uphold that finding, the circumstances of this case do not warrant dismissal.

¶ 31    This court reviews the decision of the Police Board, not the circuit court. *Mireles v. Dart*, 2023 IL App (1st) 221090, ¶ 54. In reviewing that decision, we employ a "two-step analysis." *Franko v. Police Board of City of Chicago*, 2021 IL App (1st) 201362, ¶ 42. First, we review the Board's findings. *Id*. Next, we determine whether the Board's factual findings provide a sufficient cause for the discipline imposed. *Id*.

¶ 32                         I. The Board's Findings of Fact

¶ 33    On administrative review, the findings of the Board are deemed *prima facie* true and correct. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006); 735 ILCS 5/3-110 (West 2022). We will reverse those findings only if they are against the manifest weight of the evidence—that is, only if the opposite conclusion is clearly evident. *Marconi*, 225 Ill. 2d at 534 . The " 'mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings.' " *Id*. (quoting *Abrahamson v. Illinois Department of Professional Regulation,* 153 Ill. 2d 76, 88 (1992). Thus, if the record contains evidence supporting the Board's position, its findings must be upheld. *Id*.

¶ 34 As to the Board's findings, Thrasher's sole argument is that the finding of excessive force was made using hindsight in violation of *Graham*, 490 US 386. There, the Supreme Court concluded that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. While our supreme court has never officially adopted the *Graham* standard for the purposes of Police Board proceedings, this court has recognized it as a potential challenge to the Board's findings. See, *e.g.*, *Rialmo v. Brown*, 2022 IL App (1st) 201231-U, ¶ 119.

¶ 35 Thrasher argues that the Board's focus on the fact that Granton was unarmed at the time of the shooting, and that the gun discharged in his pocket, are undeniably based on hindsight. He particularly focuses on the Board's findings that Granton "did not pose an imminent threat to anyone" because he was unarmed and had thrown the gun away. He claims that these facts could not have been confirmed without the benefit of 20/20 hindsight.

¶ 36 But the Board's decision was based primarily on the fact that Thrasher did not make a sufficient *attempt* to determine *whether* Granton was armed before discharging his weapon. The Board concluded that Thrasher let his (understandable) fear overtake him, causing him to forget his training and fail to properly assess the situation. That is not hindsight. That is looking at the situation as Thrasher faced it, with the assistance of his own testimony, the testimony of Alexander, and the BWC footage.

¶ 37 At the time of the event, Alexander thought it "obvious" that Granton was not holding a gun, as he was gripping the fence with both hands. The BWC footage likewise shows rather clearly that Granton had nothing in his hands as he ran toward the fence. His hands were open, not fists, as he pumped his arms, and then, of course, he gripped the top of the fence as he tried

to clear it. It was while Granton's hands were over his head, clutching the fence, turned away from Thrasher, that Thrasher first discharged his weapon.

¶ 38    We understand Thrasher's point—easy for us to say, from the comfort of our offices, watching a video, running it back and forth, even using slow-motion; it's much different when you're an officer in the moment, having heard a gunshot and having at least *some* reason to believe that the fleeing suspect might still have whatever weapon he had just fired.

¶ 39    His point is well taken. Police officers have exceedingly difficult jobs, most especially at moments like here. But we cannot say the Board's finding of excessive force was against the manifest weight of the evidence; we cannot say the opposite conclusion was clearly evident or that the record provides no support for the Board's position.

¶ 40    The Board's principal point was that, even if it was not clear that Granton was *not* armed, it was certainly not clear that he *was*, either. Add in the fact that Granton was not moving in Thrasher's direction and was trying to flee. The visual evidence facing Thrasher gave him more than sufficient reason to doubt that Granton was an imminent threat. The Board reasonably determined that Thrasher could have announced his office, ordered Granton not to move and to show his hands, or even returned to cover instead of moving into an open space and approaching Granton (given the multiple other armed officers on the scene)—any number of things that should have preceded the decision to merely open fire, which is supposed to be the last resort.

¶ 41    This country, and this city, have unfortunately been witness to many cases of excessive use of force in recent years. We do not lump this shooting in as among the worst. Nobody adjudicating this case—not the Board, not the circuit judge, and not this court—believes that Thrasher acted with any malicious intent. Thrasher panicked, understandably, and failed to follow his training. But a young man died, and in the Board's view, an officer following his

training could have prevented that from happening. As judges, we review the evidence with deference to the expertise of the Board. See *Franko*, 2021 IL App (1st) 201362, ¶ 46. We cannot say that the finding of excessive force was in error. We thus uphold it.

¶ 42                                II. Decision to Discharge

¶ 43     We turn to whether the finding of excessive force warranted the sanction of dismissal. "An administrative tribunal's finding of 'cause' for discharge commands our respect." *Walsh v. Board of Fire & Police Commissioners of Village of Orland Park*, 96 Ill. 2d 101, 105 (1983); see *Bless v. Cook County Sheriff's Office*, 2024 IL App (1st) 230256, ¶ 37. The Board, not a reviewing court, is in the best position to determine the effect of an employee's conduct on the agency. *Bless*, 2024 IL App (1st) 230256, ¶ 37; *Lopez v. Dart*, 2018 IL App (1st) 170733, ¶ 75. We will only reverse the discipline imposed if it is arbitrary, unreasonable, or unrelated to the requirements of service. *Walsh*, 96 Ill. 2d at 105-06; *Bless*, 2024 IL App (1st) 230256, ¶ 37.

¶ 44     Thrasher, citing the extensive character evidence presented in his favor, argues that his actions should be considered a "mistake" in a highly stressful and dangerous situation. He pleads that, "at a time when morale in the CPD is disturbingly low, and distrust of the CPD is alarming[ly] high, the Board has done a disservice to the City of Chicago and the CPD by robbing them of a unique, respectful, and dedicated officer." Our review of the evidence here clearly shows that Thrasher cared deeply about the citizens of this City and had otherwise served as an upstanding officer.

¶ 45     But under our highly deferential standard of review, we cannot find error in the Board's determination. The Board reasoned that Thrasher exhibited "a gross disregard for the safety of members of the public" in his rash and improper reaction to the events in question. We cannot say that this finding is arbitrary or unreasonable, given the evidence we have recounted above.

The Board found that returning Thrasher to duty, "armed and authorized to use deadly force, poses an unacceptable risk to the safety of the public and Chicago police officers." We are in no position to second-guess the Board's expertise and judgment on these matters.

¶ 46 As we have already noted, by all accounts Officer Thrasher is a good man, devoted to his job, to his family, and to his community, and the action that brings him before us was the product of panic, not ill will. Perhaps it is fair to characterize his conduct here, as he does, as a mistake. But as our courts have long recognized, "[a] police officer hardly can commit a more serious offense" or "undermine public confidence in the ability and good judgment of police officers more than the misuse of firearms." *Walsh*, 96 Ill. 2d at 106; see *Kappel v. Police Board of City of Chicago*, 220 Ill. App. 3d 580, 593 (1991).

¶ 47 The discipline of dismissal under these circumstances was clearly related to the requirements of service and was not arbitrary or unreasonable. We uphold it.

¶ 48                                    CONCLUSION

¶ 49 The judgment of the circuit court, affirming the Board's decision, is affirmed.

¶ 50 Affirmed.