2022 IL App (1st) 210068-U

No. 1-21-0068

Order filed June 28, 2022.

Second Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| POLICE OFFICER JANET MONDRAGON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| POLICE BOARD OF THE CITY OF CHICAGO; | ) | No. 19 CH 9655 |
| MAX CAPRONI, EXECUTIVE DIRECTOR OF | ) | |
| THE POLICE BOARD OF CHICAGO; and | ) | |
| EDDIE JOHNSON, SUPERINTENDENT OF | ) | |
| THE CHICAGO POLICE DEPARTMENT, | ) | The Honorable |
| | ) | Raymond W. Mitchell, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: The administrative agency's decision was not against the manifest weight of the evidence. The decision to discharge the appellant for cause was not arbitrary or unreasonable. Appellant's case was properly consolidated, and appellant failed to establish the conflicts-of-interest claim against her attorneys. This court affirmed the circuit court's judgment affirming the administrative agency's decision to discharge the appellant from work.

¶ 2      In 2016, Chicago's Police Superintendent (Superintendent) filed disciplinary charges against officer Janet Mondragon, alleging that she violated a number of Chicago Police Department (CPD) Rules and Regulations.[1] Specifically, she allegedly made false and misleading statements about the shooting death of seventeen-year-old Laquan McDonald and also failed to ensure her police vehicle's audio system was operational that night. After an administrative hearing in 2019, which was consolidated with that of three other officers, the Police Board of the City of Chicago (Police Board) concluded that Mondragon violated the CPD rules as alleged, and she was discharged. Mondragon filed a complaint for administrative review, and the circuit court affirmed the Police Board's decision. She now appeals, contending the Police Board's findings were against the manifest of the evidence and her discharge was without just cause. Mondragon also contends her case was improperly consolidated with other officers and her attorneys were ineffective due to a conflict of interest. We affirm.

¶ 3                          BACKGROUND

¶ 4      The charges in this case stem from the October 20, 2014, shooting of McDonald, which has received extensive media attention and which resulted in Mondragon's former fellow Chicago police officer, Jason Van Dyke, being convicted of second-degree murder and aggravated battery. About 9:50 p.m. that evening, pursuant to a radio request for assistance, Mondragon approached the scene in her marked squad SUV and saw McDonald running in the middle of the street, south on Pulaski Road. With her dashcam operating without any audio, Mondragon slowly drove behind McDonald and then captured on video the fatal shooting by Van Dyke. The administrative charges at issue in this case basically resulted from the disparity

_____

[1]We note that Superintendent Eddie Johnson has been succeeded by David Brown.

between Mondragon's various statements as to what she saw that evening and what the dashcam captured.

¶ 5     Shortly after the shooting, Detective David M. March interviewed Mondragon on the scene. The report stated that while driving behind McDonald as he waved a knife, Mondragon saw Van Dyke and former police officer Joseph Walsh outside their police vehicle and heard them repeatedly ordering McDonald to drop the knife. According to Mondragon, McDonald drew closer and closer to the officers while continuing to wave the knife. Mondragon reported that as she placed her police vehicle in park, she "looked down and heard multiple, continuous gunshots, without pause." She then saw McDonald fall to the ground but claimed she "did not know who fired the shots."

¶ 6     Mondragon made two additional statements. First, just hours after the shooting, Mondragon provided a statement to the Independent Police Review Authority. She was notified that any failure to provide a complete and accurate account could result disciplinary action, including discharge. As with Detective March, Mondragon issued a similar statement but omitted that McDonald drew closer to the officers. She also stated that she heard "several" shots fired but again did not know who was shooting. When asked whether McDonald was facing the officers while waving the knife, she responded, "Honestly, I, I (noise) how would I recall."[2] Mondragon further said that after she heard the gunshots, her car was "still moving" and that she saw "the offender drop down." After that, she only remembered exiting her car and seeing "traffic comin' our way."

_____

[2]We note the transcript does not include the word "knife" in this specific question (instead, where the word knife might be, there's an "inaudible" notation). Based on the context of this question and those previously asked, however, we can presume the question referred to the knife.

¶ 7      Van Dyke was criminally charged on November 24, 2015, with first degree murder and official misconduct. *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 6. Eventually, the investigation of the shooting was referred to the city's Office of the Inspector General (Inspector General). On March 22, 2016, after again being advised of her rights as to potential disciplinary action, Mondragon, while represented by counsel, was interviewed by the Inspector General. The Inspector General reviewed Mondragon's initial statement to Detective March and inquired whether it was accurate, going line by line. According to her earlier statement, Mondragon reported that McDonald drew closer and closer to the officers, but in the interview she clarified that McDonald was simply moving southbound in the direction of the officers. According to her earlier statement, she heard multiple continuous shots, but she clarified that she heard only several shots.

¶ 8      Mondragon also stood by her earlier statement that she did not know who fired the shots, adding that she did not see who was shooting because she was driving and focused on McDonald. Similarly, she could not recall whether she saw McDonald actually being shot, stating "I don't recall if I actually saw -- like I said, I put it on park, heard the shots. He fell to the ground." However, when asked if she saw McDonald fall to the ground, Mondragon stated, "I don't know. I don't remember." The Assistant Inspector General observed: "So you didn't see who was shooting because you were focused on the offender [McDonald], but you did not see the offender [McDonald] actually fall to the ground?" Mondragon responded, "Like I said, I don't remember that, but there was two officers with their guns drawn."

¶ 9      Mondragon, who acknowledged that she had never witnessed a shooting before, summarized the occurrence as follows: from the corner of her eye she saw Van Dyke and Walsh exit their car with guns drawn, she looked at McDonald and then down to place her car in park,

4

heard shots, and by then, the shooting was over. She did not know why she did not look back up. Mondragon stated, "So everything, you know, happened so fast. I saw them get out of the car. Next thing you know, I put it on park, and that was it." Nevertheless, she also told the Inspector General that the parking control handle was on the steering wheel, and parking thus required one to face forward, not look down. Mondragon further stated that while she and Van Dyke were coworkers, they did not socialize outside of work other than once attending a Fraternal Order of Police ("FOP") picnic. In addition, the Inspector General reviewed with Mondragon her second statement to the Independent Police Review Authority.

¶ 10    In 2016, the Superintendent filed disciplinary charges against Mondragon, recommending her discharge from the police force. Principally, the Superintendent alleged that Mondragon had made false and misleading statements to the authorities investigating the shooting when she reported looking down while placing her car in park and heard but did not see the shooting or that it was Van Dyke who committed it. The Superintendent further alleged that Mondragon failed to ensure the audio of her car's video system was operational. Based on these allegations, the Superintendent charged Mondragon with violating a number of the CPD's Rules and Regulations, including Rule 2 ("Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department."), Rule 3 ("Any failure to promote the Department's efforts to implement its policy or accomplish its goals."), Rule 6 ("Disobedience of an order or directive, whether written or oral."), Rule 11 ("Incompetency or inefficiency in the performance of duty."), and Rule 14 ("Making a false report, written or oral.").

¶ 11    Mondragon's case was ultimately consolidated for a hearing with that of two other officers at the scene – her partner, Daphne Sebastian, and Ricardo Viramontes – and also that of

her immediate superior that evening, Sergeant Stephen Franko.[3] The hearing officer consolidated the cases, finding that the evidence and exhibits under review related to McDonald's shooting and the police misconduct charges that arose as a result. In addition, while Mondragon's pre-hearing and hearing attorneys presented potential conflicts of interest, as discussed in further depth below, the record indicates Mondragon waived the issue. The cause then proceeded to an evidentiary hearing from April 10 to April 12, 2019.

¶ 12     There, Mondragon testified consistently as to how the initial events unfolded that evening. She again testified that she was focused on McDonald. After Van Dyke and Walsh exited their vehicle, Mondragon heard gunshots and within "milliseconds" saw McDonald fall to the ground. During her testimony, the Superintendent played portions of the dashcam video, which Mondragon admitted was generally consistent with her perspective at the time. She agreed the video showed that when the shots started, her vehicle was still moving, and this vitiated the notion that she was looking down just then to put her vehicle in park. Mondragon, moreover, testified she could not recall hearing more shots fired after her vehicle was placed in park and could not recall whether Van Dyke, who was about ten feet from McDonald, was still shooting when she looked up from parking. Mondragon maintained she saw Van Dyke in her side vision only. She claimed to have heard only several shots, which she defined as "more than one."

¶ 13     Mondragon agreed that March's report containing her first-recorded statements accurately stated that she did not see who fired the shots because she was looking down at her vehicle transmission, but she claimed it was out of order. The correct order of events was:

---

[3]The case involving Mondragon and the other officers was stayed in 2017 pending the disposition of Van Dyke's criminal trial and other criminal proceedings relating to the killing of McDonald. In November 2018, the stay was vacated, and Van Dyke's administrative case was severed from that of the other officers following his criminal conviction.

"[W]hen they both got out of the vehicle, they both had their guns out. I hear drop the knife, drop the knife several times. Then I look at Laquan, he goes down, and the next thing you know, you know, I probably flinched a little bit when I heard the shots and then I put the car in park. It happened so fast."

¶ 14    Mondragon acknowledged that as a police officer, she was trained to handle the evolving and potentially dangerous situation that presented itself with McDonald. She was also familiar with her patrol vehicle, since she had driven it multiple times already. As such, it would take only a few seconds to place it in park, not fifteen, which she conceded was about how long the shooting lasted. On cross-examination, Mondragon stated that she knew Van Dyke or Walsh was the shooter or "it could have been both of them." On redirect, she stated she did not tell investigators that fact because they asked her "what I saw, not what I knew." Mondragon also acknowledged that she and Van Dyke were friends in addition to coworkers, and as phone records revealed, they texted every day and sometimes numerous times per day in the weeks prior to the shooting. On October 11, 2014, they exchanged 70 texts. Finally, on redirect, she acknowledged the importance of noting the details of a shooting that results in death, and when her shift ended on October 20, 2014, she had no idea so many investigations would unfold from this incident.

¶ 15    Tina Skahill testified next that she was the Commander/Director of the CPD's Bureau of Internal Affairs, which was responsible for investigating misconduct allegations and rule violations. Skahill testified as to the significance of Rule 14, which Mondragon was charged with violating and which prohibits willfully making a false written or oral report that is material. Skahill testified that dishonesty by a single officer could impair public confidence in the police department and cast serious suspicions on the department, which in turn impaired the CPD's

ability to perform its mission of protecting and serving the community. Skahill testified that Rule 14 violations hinder police work, and as result, officers with those violations are often recommended for discharge. For example, the State's Attorney's Office sometimes declines to call those officers to testify in criminal investigations. When the CPD partners with federal agencies, like the FBI, Rule 14 officers are considered a "red flag" and will not be placed on a task force. According to Skahill, such officers cannot perform all the functions and duties for which they were hired. On cross-examination, Skahill nonetheless acknowledged there were a number of CPD officers with Rule 14 violations who maintained their police positions, although they were removed from patrol and not performing arrests.

¶ 16    The Superintendent also presented evidence that officers were required to check their video system and audio by placing microphones "on their person." However, following the McDonald shooting, evidence showed Mondragon's microphone was in the glove box with the batteries removed or upside down and no audio accompanied the video. Mondragon acknowledged she had not been in the practice of wearing her microphone, even though it was a requirement, and the night of the shooting she did not check for her microphone or know where it was.

¶ 17    In her defense, Mondragon presented three character witnesses, including a former police sergeant, a community advocacy director, and fellow police officer, who testified that she had an outstanding reputation among her peers and supervisors in her police district. She was honest, truthful, hardworking, reliable, respected, as well as compassionate with the victims and their families and the community. Her employment records contained no complaints. She had no disciplinary record, but rather, five awards, complimentary letters, and recognitions.

¶ 18    Following this evidence and argument, nine members of the Police Board reviewed the record of proceedings and a video-recording of the entire evidentiary hearing. The hearing officer made an oral report to the Police Board and conferred with it before the final decision. The Police Board found Mondragon had violated the departmental rules as charged, insofar as she failed to provide truthful, accurate, consistent, and complete statements of what she had observed, as required. The Police Board found her conduct was antithetical to that expected and required of a sworn law enforcement officer, where she reported *only* hearing the shots but *not* seeing key aspects of the encounter, like who was the shooter, since she was looking down to place her vehicle in park. Yet, the Police Board found the dashcam video established without question that Van Dyke shot McDonald for fifteen seconds and Mondragon conceded it would take only a few seconds to park. Moreover, the dashcam video showed her car was still moving for the first four seconds of the shooting. The Police Board thus determined that Mondragon was in a position to see what transpired for at least four seconds from the time the shooting began and again after McDonald was on the ground being hit with multiple rounds, yet she decided "not to say what she saw." The Police Board noted that Mondragon's position of observation was critical and her statements crucial to understanding what happened that evening to determine whether the shooting was justified or an officer-committed crime. The Police Board then specifically found Mondragon's vantage point as depicted on the dashcam was material in that it established the shooting was unjustified.

¶ 19    The Police Board noted that an officer is obligated to provide a complete and accurate account when witnessing the killing of a civilian, even if the observations reflect negatively on a fellow police officer. The Police Board thus concluded that Mondragon's "obvious lie" was willful and "designed to avoid reporting negative information about her fellow officer," for his

benefit. They added that her misleading statements were "intended as a shield to prevent all of the facts surrounding that night from coming to light[.]" The Police Board noted that CPD Rules 2 and 3 require that officers not only provide a complete and accurate accounting of their observations while on duty, but also prohibit officers from making "misleading statements which emphasize certain facts to the exclusion of others," as well as from cherry-picking facts to support the officer's preferred conclusion. She thus violated Rules 2 and 3 by bringing discredit on the CPD and by thwarting the CPD's purpose of implementing policy and of accomplishing its goals. Mondragon further violated CPD Rule 14, with her intentional false report of material value.

¶ 20    Finally, the Police Board concluded Mondragon violated Rules 2, 3 and 6 (prohibiting disobedience of an order), as well as 11 (prohibiting incompetency or inefficiency in performing a duty) by failing to ensure her vehicle's audio was in working order, finding she did not so much as contest this charge.

¶ 21    Accordingly, the Police Board found there was good cause to discharge Mondragon. In assessing that penalty, the Police Board considered the evidence in mitigation, Mondragon's complimentary work history and her lack of disciplinary complaints, but deemed discharge nonetheless appropriate because, after witnessing the fatal shooting of a seventeen-year-old by a fellow officer, Mondragon decided "to say she did not see what happened, when she clearly did." The Police Board concluded that given the context of the case, Mondragon's misconduct was serious, reprehensible, and undermined her integrity and effectiveness as a police officer. The Police Board found that (under Rules 2 and 3) Mondragon's misconduct brought discredit on the CPD, since it fostered public distrust and a lack of confidence in the department's integrity. As such, her continued service would harm the CPD's efforts to prevent crime, preserve the public

10

peace, identify and arrest criminals, and promote respect and cooperation among Chicagoans for the law and those sworn to enforce it.

¶ 22    In addition, Mondragon's misconduct (under Rule 14) rendered her unfit to serve since trustworthiness, reliability, good judgment, and integrity were all necessary qualifications for the job. The guilty finding would also be detrimental to Mondragon's credibility as a testifying witness in civil and criminal cases, which would be a liability to the CPD. The Police Board added that the Rule 2 and 3 violations were also sufficiently serious to alone warrant discharge. The Police Board also discharged Sebastian, Franko, and Viramontes for similar rule violations.

¶ 23    Mondragon subsequently filed a complaint for administrative review in the circuit court, seeking to be reinstated, as did other the officers. The circuit court affirmed the Police Board's decision as to Mondragon, concluding that it was supported by competent evidence and that discharge was reasonable given the importance of public trust in the CPD as an institution. This appeal followed.

¶ 24                              ANALYSIS

¶ 25    In an appeal from the judgment of an administrative review proceeding, this court reviews the decision of the administrative agency and not the decision of the circuit court. *Chisem v. McCarthy*, 2014 IL App (1st) 132389, ¶ 20.[4] Our review consists of a two-step process, the first of which is to determine whether the agency's factual findings are against the manifest weight of the evidence. *Cinkus v. Village of Stickney Municipal Officers Electoral Police Board*, 228 Ill. 2d 200, 210 (2008); *Kappel v. Police Board of the City of Chicago*, 220 Ill. App. 3d 580, 588 (1991). In the second, we must determine if the factual findings provide a

---

[4]In her reply brief, Mondragon challenges the Police Board's reliance on *Chisem*, asserting that it is an unpublished case. While initially issued as an unpublished order, *Chisem* was subsequently withdrawn and published as an opinion under Supreme Court Rule 23 (eff. April 1, 2018).

sufficient basis for the agency's conclusion that cause for discharge exists. *Crowley v. The Board of Education of City of Chicago*, 2014 IL App (1st) 130727, ¶ 29; *Kappel*, 220 Ill. App. 3d at 588-89. Thus, an agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service. *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 46 (2001).

¶ 26                    *The Police Board's Factual Findings and Manifest Weight*

¶ 27     Mondragon first contends the Police Board's findings were against the manifest weight of the evidence. An agency decision is contrary to the manifest weight of the evidence only if, after viewing the evidence in the light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident. *Daniels v. Police Board of City of Chicago*, 338 Ill. App. 3d 851, 858 (2003). The mere fact that an opposite conclusion is reasonable or that a reviewing court might have ruled differently will not justify reversal of the administrative findings. *Abrahamson v. Illinois Dept. of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). In other words, a reviewing court may not substitute its judgment for that of the administrative agency, and where, as here, the record contains evidence supporting the agency's decision, it should be affirmed. See *id*.

¶ 28     Here, the evidence, consisting of Mondragon's adverse testimony, prior statements/interviews, and the dashcam video, supported the Police Board's determination that Mondragon decided "to say she did not see what happened" during the shooting of McDonald "when she clearly did." The Police Board found Mondragon's statements that did she not see who was shooting because she was placing the vehicle in park were contradicted by the video. The video supports the finding that Van Dyke committed the shooting for fifteen seconds and shows Mondragon's vehicle moving during the first four seconds, thus indicating she saw the

shooter during those initial moments.[5] In addition, Mondragon conceded at the hearing it would only take several seconds to park, having noted before that the parking control handle was on the steering wheel, which would have required one to face forward rather than look down. See *Ahmad v. Police Board of Education of City of Chicago*, 365 Ill. App. 3d 155, 162 (2006) (noting, that regardless of the reasoning provided by an agency for its decision, this court may affirm an agency's decision on any basis appearing in the record). Once her vehicle came to a stop, the video, which she agreed generally reflected her own perspective, shows the shooting continued; puffs of smoke from the gunshots emitted from McDonald's body.[6] This supports that she also saw the shooter after placing her car in park.

¶ 29    The evidence further established that Mondragon had driven this particular squad car multiple times prior to the incident, and she was a trained officer with years of experience who had never seen a police-involved shooting. This suggests she would have been focused on the events unfolding before her with the ability to appropriately multitask. Given all these facts, including the duration of the shooting and her proximity to Van Dyke and McDonald, it defies belief that Mondragon did not see Van Dyke shooting McDonald.[7] Further, while Mondragon

---

[5]On appeal, Mondragon asserts that she "told investigators on multiple occasions that either Officer Van Dyke, Officer Walsh, or both were responsible for shooting Mr. McDonald, but she was unable to tell which officer from her vantage point." In support of this assertion, she points to her statements issued shortly after the shooting to Detective March and the Independent Police Review Authority. We have reviewed those statements. In them, Mondragon reports that she did not know who fired the shots and did not know who was shooting. Her assertion on appeal is thus a complete mischaracterization of the facts in the record. Indeed, at the hearing, Mondragon conceded she did not tell the investigating officer that she knew the shooter was Van Dyke or Walsh because "he asked me what I saw, not what I knew."

[6]Mondragon argues there was "no witness to testify that her perspective matches the perspective of the dashcam." However, the record is clear that *she was the witness* to testify the dashcam generally reflected her own perspective. On appeal, she fails to further explicate or identify any legal authority that more is required to establish that factual point. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

[7]In challenging the manifest weight of the evidence, Mondragon notes that her partner, Sebastian, a passenger in their vehicle, also reportedly stated she did not know who fired the fatal shots at McDonald. Mondragon complains there was no similar charge against Sebastian for that statement and

initially reported that Van Dyke was a coworker only, the hearing evidence revealed that they were friends as well, texting frequently, which supports the Police Board's conclusion that Mondragon was lying or obscuring facts to protect a fellow police officer. Viewing the evidence in a light most favorable to the Police Board, as we must, we cannot say the opposite conclusion is warranted. Rather, the Police Board's determination was amply supported by the evidence and inferences flowing therefrom.

¶ 30 Mondragon nevertheless maintains she was consistent in reporting both what she saw, and did not see, on the evening in question and testified credibly that she was focused on McDonald, as he was the threat. The record, however, reveals Mondragon's statements to be inconsistent. In addition to the points cited above, we note Mondragon first reported that McDonald drew closer and closer to the officers, but later clarified McDonald was simply moving southbound. Mondragon first reported she heard multiple, continuous shots, but later clarified it was "several," a fact contradicted by the video. In another instance, Mondragon reported seeing McDonald drop down but later reported she couldn't recall seeing that, even though in that latter interview Mondragon also claimed her specific focus on McDonald precluded her from seeing who was shooting. Finally, she reported to the Inspector General that she first placed the car in park and heard the shots, but at trial stated that she heard the shots, "probably flinched a little," and *then* placed the car in park.

¶ 31 Regardless, the Police Board found the tenuous and shifting rationale for why Mondragon did not see the shooting that occurred right before her eyes, when measured against

argues this constitutes "proof" that Mondragon's firing was politically motivated. As the Police Board notes, Sebastian was nevertheless charged with violations of Rules 2, 3, and 14, for making false or misleading statements about McDonald's actions in relation to the officers at the time of the shooting, and she was discharged. Thus, while the factual basis underlying Sebastian's charges was different, the outcome was the same. Mondragon's argument is therefore unsound.

the dashcam footage, rendered her incredible. See *Cannici v. Department of Employment Security Board of Review*, 2021 IL App (1st) 181562, ¶ 48 (noting, a fact finder may disbelieve testimony that is contradicted by the circumstances or inherently improbable); *Jimenez v. Department of Financial and Professional Regulation*, 2020 IL App (1st) 192248, ¶ 47 (noting, a fact finder can accept or reject as much or as little of a witness's testimony as it pleases). Moreover, as the circuit court noted, the Police Board "was free to credit the video and to reject portions of [Mondragon's] testimony." See *id.* In reality, Mondragon asks us to reweigh the evidence and make credibility determinations, which we are not at liberty to do. "It is not the court's function to resolve factual inconsistencies, nor is it the court's duty to weigh the evidence and then determine where the preponderance of the evidence lies." *Launius v. Police Board of Fire and Police Commissioners of City of Des Plaines*, 151 Ill. 2d 419, 427-28 (1992); see also *People v. Hour*, 365 Ill. App. 3d 682, 686 (2006) (noting that a preponderance of the evidence means a proposition is more likely true than not). The Police Board, as the finder of fact, makes credibility determinations and assigns weight to testimony and other evidence. *Chisem*, 2014 IL App (1st) 132389, ¶ 21

¶ 32     For the same reasons, we reject Mondragon's suggestion that because she did not lie about or exaggerate the threat McDonald posed, as did other officers, she must have been telling the truth. The Police Board clearly found Mondragon's omission and false statements just as harmful; again, this was a matter of factual weight and credibility for the Police Board to resolve. Plus, given Mondragon's claim throughout her brief that the Police Board improperly considered hearing evidence as to the other officers, we find it contradictory that she cites similar evidence to support her challenge under the manifest weight standard.

¶ 33    Next Mondragon contends the Superintendent failed to establish her statements were materially false under Rule 14, which prohibits false statements that are willful and material, *i.e.* those "critical to the incident." She argues her statements did not aid Van Dyke and were "inconsequential to the investigation" since no one specifically relied on them to identify the shooter. We disagree.

¶ 34    Here, the Police Board found Mondragon's vantage point was critical to understanding what occurred that evening and material in that it established the shooting by Van Dyke was unjustified. According to the Police Board, Mondragon was obligated to provide both a complete and accurate account when witnessing the killing of a 17-year-old civilian. Yet, her "obvious lie" was intended to obscure critical facts. We cannot say these findings were against the manifest weight. Regardless, Mondragon's claim is immaterial, where the Police Board also found Mondragon's violations of CPD Rules 2 and 3, which lack a materiality requirement, were independently sufficient to sustain her discharge. This makes sense, as it is eminently reasonable for the Police Board to insist officers accurately report the conduct of fellow officers. This is especially true, where police officers are often the only witnesses to incidents like the present. For these reasons, Mondragon's argument challenging the Police Board's decision as against the manifest weight of the evidence fails.

¶ 35                    *The Police Board's Determination of Cause*

¶ 36    We next consider whether the findings of fact provide a sufficient basis for the Police Board's conclusion that cause for discharge exists. "Cause" for discharge has been judicially defined as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for [her] no longer holding the position." *Kappel*, 220 Ill.

App. 3d at 589, citing *Department of Mental Health v. Civil Service Commission*, 85 Ill. 2d 547, 551 (1981). Because the Police Board is in the best position to determine the effect of an officer's conduct on the operations of the department, its determination of cause is given considerable deference. *Chisem*, 2014 IL App (1st) 132389, ¶ 20. Thus, we may not consider whether we would have imposed a more lenient sentence, since this court cannot sit as a super-commission in reviewing the punishment imposed. *Krocka*, 327 Ill. App. 3d at 48; *Kappel*, 220 Ill. App. 3d at 590. Accordingly, the Police Board's decision will be overturned only if it is arbitrary or unreasonable in the selection of discipline, or unrelated to the requirements of the service. *Siwek v. Police Board of City of Chicago*, 374 Ill. App. 3d 735, 738 (2007). We cannot say that is the case here.

¶ 37    Competent evidence supported the Police Board's finding that sufficient cause existed to discharge Mondragon because her false, inaccurate, and misleading statements about the police-involved shooting of a civilian thwarted the CPD investigation, discredited the CPD, and inspired distrust among the community she was sworn to serve and protect. There is no question that such disregard for the rules is detrimental to the discipline and efficiency of the CPD. See *Krocka*, 327 Ill. App. 3d at 48-49. An officer is in a unique position of public trust requiring sound judgment, transparency, and responsibility to the public and the CPD. See *Remus v. Sheahan*, 387 Ill. App. 3d 899, 904 (2009). Moreover, the Police Board concluded that Mondragon's guilty finding would be detrimental to her ability to testify as a witness in civil and criminal cases, and this would be a liability to the CPD. The Police Board was clearly referencing the testimony of Skahill, the Commander/Director of the CPD's Bureau of Internal Affairs, who testified as to the significance of Rule 14 violations and that they hindered officers from performing the duties for which they were hired. Mondragon's overall conduct thus directly

related to her service as a CPD officer, and it was not arbitrary or unreasonable for the Police Board to terminate her on that basis. *Krocka*, 327 Ill. App. 3d at 48-49.

¶ 38    Mondragon nevertheless insists the discipline imposed was arbitrary. Also citing Skahill's testimony (albeit on cross), Mondragon asserts that officers — other than those involved in this administrative case — with Rule 14 violations have maintained their police positions, and she should too. She further notes that she was allowed to remain on patrol two years after the shooting and placed on pay status while the hearing was stayed. Mondragon fails to cite specific legal authority for these arguments or further develop them, thus resulting in forfeiture. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *First Mercury Ins. Co. v. Nationwide Sec. Services, Inc.*, 2016 IL App (1st) 143924, ¶ 21. Regardless, they have no merit. Just because other officers have been disciplined differently is not a basis for concluding that the Police Board's disciplinary decision is unreasonable; rather, such conclusions are appropriate when the officers receive different discipline in an identical, "completely related" case. See *Launius v. Board of Fire & Police Commissioners of Des Plaines*, 151 Ill. 2d 419, 441-42 (1992); *Siwek*, 374 Ill. App. 3d at 738. Again, Mondragon has not pointed to a comparable case. Given that she was charged with obscuring facts related to the shooting, her argument that she was permitted to remain on patrol for two years after the shooting is not persuasive. In other words, that it took some time for the Police Board to make its determination in this very serious case, which was complicated by concurrent criminal proceedings involving other officers, does not undermine its ruling as to cause for discharge; rather, it strengthens it.

¶ 39    Mondragon also notes the mitigating evidence showed her good character and conduct and is reason to retain her position.[8] However, an administrative agency need not give mitigating

_____

[8]Mondragon miscites the record in support of this argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). The pages of the record on which she relies relate to Franko, not Mondragon.

evidence more weight in a termination decision, and a discharge decision made despite the presentation of such evidence is not, without more, arbitrary or otherwise erroneous. *Siwek*, 374 Ill. App. 3d at 738-39. Likewise, a single instance of misconduct can constitute cause for discharge where the misconduct is serious. *Hermesdorf v. Wu*, 372 Ill. App. 3d 842, 853 (2007), and cases cited therein. For these reasons, Mondragon's argument challenging the Police Board's decision as unreasonable and arbitrary must fail.

¶ 40 Finally, we note that Mondragon does not dispute the Police Board's findings that she failed to ensure that the audio component of her in-car video system was working at the start of her shift or its determination that she therefore violated CPD Rules 2, 3, 6, and 11. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

¶ 41                                  *The Police Board's Consolidation of Cases*

¶ 42 Mondragon next challenges the Police Board's decision to consolidate her case with those of Sebastian, Viramontes, and Franko. Mondragon contends the Police Board failed to assess her case based solely on the evidence against her, thus causing prejudice. The Police Board responds that Mondragon forfeited any challenge to consolidation by failing to object to or develop the issue before the hearing officer. It is well-settled that on administrative review a party forfeits any issue that it failed to raise in proceedings before the administrative agency. *Demesa v. Adams*, 2013 IL App (1st) 122608, ¶ 52. In her opening brief, however, Mondragon insists that she *did* object to consolidation. Mondragon's claim is belied by the record, which shows that while she objected to her case being consolidated with Van Dyke's, she did not object to consolidation with the other officers. Mondragon therefore forfeited the matter.[9]

---

[9]In her reply brief, Mondragon claims the Police Board is "hiding behind a series of waiver arguments." The Police Board cannot be faulted for following the rules of appellate practice. We further note our Supreme Court has stated the principle "that forfeiture is a limitation on the parties and not on the reviewing court" is a narrow exception. *In re Br. M.*, 2021 IL 125969, ¶ 39.

See *Carpetland U.S.A., Inc. v. Illinois Dept. of Employment Security*, 201 Ill. 2d 351, 396-97 (2002) (generally, issues or defenses not raised before the administrative agency will not be considered for the first time on administrative review).

¶ 43    Even forfeiture aside, Mondragon's contention holds no water. Our courts have found no abuse of discretion where the separate causes are of the same nature; arise from the same act, event or transaction; involve the same or like issues; and depend largely or substantially upon the same evidence; and when a joint trial will not give one party an undue advantage or prejudice the substantial rights of any party.[10] *Daniels*, 338 Ill. App. 3d at 860. In addition, administrative bodies performing quasi-judicial functions have the discretion to consolidate cases for hearing and, unless that discretion is abused, reviewing courts will not interfere with that decision. *Id.* We note that this court recently affirmed the Police Board's decision discharging Franko, who also argued that case consolidation was improper. See *Franko v. Police Board of City of Chicago*, 2021 IL App (1st) 201362, ¶¶ 1, 55.[11] For the same reasons articulated in *Franko*, 2021 IL App (1st) 201362, ¶¶ 56-58, we find no abuse of discretion here, where the cases arose from the same event (Van Dyke's shooting of McDonald), they involved like issues and charges, and depended largely on the same evidence. See *id.* Given the common issues of law and fact, consolidation was appropriate. In fact, failure to consolidate could have resulted in inconsistent findings. See *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶ 24.

¶ 44    We thus reject Mondragon's contention that consolidation led the Police Board to terminate Mondragon on the basis of the other officers' actions, thereby prejudicing her.

---

[10]In her opening brief, under the "Standard of Review" section, Mondragon argues that the issues as to consolidation and her attorneys' claimed conflict should be reviewed *de novo*. She apparently abandons that argument later in the body of her brief, where she argues an abuse of discretion standard applies to those issues.

[11]Viramontes 'appeal (No. 1-21-0015) remains pending in this court. According to the Police Board, Sebastian did not appeal.

Mondragon points to the Police Board's order, stating that while "officers must provide a complete accounting without embellishment, exaggeration, or spin," here "all three patrol officers [Mondragon, Sebastian, and Viramontes] violated that duty by describing the alleged threat posed by Mr. McDonald in an exaggerated way, *while omitting relevant facts that support the opposite conclusion*." (Emphasis added.) The Police Board continued: "The overall impression based on this selective telling is both misleading and false."

¶ 45    Mondragon notes she did not exaggerate McDonald's threat as did Sebastian and Viramontes, who collectively reported that McDonald turned towards Van Dyke, waving the knife, and attempted to get back up with the knife still in hand. She thus maintains the Police Board exhibited prejudice against her by lumping her together with those officers. The excerpt, when read closely in context, however, focuses not just on officers reporting McDonald's exaggerated threat, but also on officers omitting key information to support the "opposite conclusion," *i.e.* that McDonald was justifiably shot. As set forth, the Police Board found Mondragon omitted key information when she reportedly did not see the shooting. While the sentence Mondragon points to was unartfully written, when read in context, it is based on the evidence offered against her.

¶ 46    Second, Mondragon notes that, according to the Police Board, she made another statement to the Independent Police Review Authority hours after the incident reporting she did not see the shooter, and this was "even after the dash cam video from her car was being played at Area Central where she gave her statement." Mondragon asserts no witness testified about the video at Area Central. She also argues the Police Board used evidence that other officers lied even after the video played there as proof that Mondragon lied, as well. Apart from the confusing nature of this argument, and its lack of citation to the record (see Ill. S. Ct. R. 341(h)(7) (eff. Oct.

1, 2020)), it is misleading. Among the Superintendent's exhibits entered against Mondragon at the hearing was Exhibit 19, Mondragon's interview with the Inspector General on March 22, 2016. In that interview, she was questioned as to whether she watched her dashcam video at Area Central after the shooting, thus implying it was being played. In the interview she responded that she did not then watch it, but rather waited until her interview with the FBI. The facts were thus in evidence, albeit not specifically highlighted during Mondragon's hearing testimony.

¶ 47    Regardless, even if the Police Board erred in this regard or the other, we agree with the circuit court's observation that "[n]either of these points, however, figured into the Board's detailed and segregated analysis of the charge and evidence against Mondragon. There was no demonstrated prejudice stemming from the consolidation." See *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 994 (1993). The Police Board is presumed to judge each case on its own evidence and merits, and Mondragon has not persuaded us that it failed in that duty or that she was prejudiced. See *Daniels*, 338 Ill. App. 3d at 861 (noting, absent a showing to the contrary, State administrators are presumed to be people of conscience and intellectual discipline, "capable of judging a particular controversy fairly on the basis of its own circumstances."). Accordingly, Mondragon's argument as to consolidation fails.

¶ 48                    *Attorney Conflict of Interest*

¶ 49    Last, Mondragon contends her attorneys were ineffective due to a conflict of interest. She also maintains she did not knowingly waive her right to conflict-free counsel. Here, the record shows that Mondragon initially was represented by Jennifer Russell (as were Sebastian and Viramontes). In December 2018, months before the hearing, the hearing officer found on the record that Russell had a potential conflict of interest, as she had previously represented Dora Fontaine, another police officer who was at the scene of the shooting. Fontaine had testified in

the subsequent criminal trials involving the shooting and was listed as a possible witness in the administrative proceedings. Although Russell reportedly obtained her clients' waivers prior to Fontaine's testimony in Van Dyke's criminal trial, the hearing officer ordered Mondragon to further consult with a "non-conflicted counsel." Later, in a written order, the hearing officer noted this was required regardless of whether Fontaine testified at the administrative hearing and Mondragon would "need to waive such conflict on the record."

¶ 50    In early February 2019, William Fahy took Russell's place as Mondragon's counsel, although Russell continued to represent Viramontes to the hearing. Given that Fahy had also previously represented Fontaine, the same conflicts issues presented themselves. In several subsequent orders in 2019, the hearing officer wrote that the aforementioned conflict issues were disclosed to Mondragon and, in accordance with the Illinois Rules of Professional Conduct, non-conflicted counsel (*i.e.* someone other than Fahy and Russell) had advised Mondragon as to the conflicts issues. Mondragon executed a written waiver in that regard, which the hearing officer found was in "acceptable form," such that the parties could proceed to the hearing. The report of proceedings generally reflected these orders with the hearing officer at one point noting that a non-conflicted counsel named John Thomson was "in the process of advising" Mondragon about "the conflict, the nature of it, and what [her] wishes are as between retaining counsel of [her] choice and getting other counsel who are nonconflicted."

¶ 51    Trial began in April 2019. Before opening statements, the hearing officer noted the conflicts issues had been investigated numerous times and "were resolved by some letters *** tendered to the [Police] Board indicating there would be a waiver of any conflict." The hearing officer then confirmed on the record that Mondragon had seen a copy of the letter that was

tendered to her counsel and also the Police Board. Mondragon confirmed the document bore her signature, and the hearing proceeded.

¶ 52    Mondragon now contends her attorneys were conflicted for having represented Officer Fontaine previously. As the vehicle for challenging the conflict, Mondragon claims her attorneys were "ineffective." She relies on the Sixth Amendment of the U.S. Constitution (U.S. Const. Amend. VI), which grants an accused the right to counsel in "all criminal prosecutions," and also on criminal cases addressing ineffective assistance of counsel. *Id.*; see *People v. Fields*, 2012 IL 112438, ¶ 17; see also *In re Br. M.*, 2021 IL 125969, ¶ 44 (noting that a conflict-of-interest claim is a particular form of an ineffective assistance claim). More specifically, Mondragon argues a *per se* conflict exists given that Fontaine was a prosecution witness in the criminal cases and a potential witness for the Superintendent, warranting automatic reversal. See *Fields* 2012 IL 112438, ¶¶ 17-18 (noting standards for *per se* conflicts).

¶ 53    The Police Board responds that stringent and carefully constructed standards have evolved in the area of criminal law where the personal liberty of the accused is at stake, and it has been held that there is no "comparable constitutional right to be adequately represented by counsel in a civil matter or an administrative hearing." *Wolfe v. Police Board of Education of City of Chicago*, 171 Ill. App. 3d 208, 211 (1988); see also *Coleman v. Akpakpan*, 402 Ill. App. 3d 822, 829 (2010) (noting that the right to the effective assistance of counsel, which is firmly grounded in our criminal jurisprudence, does not exist on the civil side); *Kalabogias v. Georgou*, 254 Ill. App. 3d 740, 750 (1993) (same). Instead, Mondragon's right to counsel is wholly statutory, and she merely has the right to counsel of her "own choosing" to be present at "any hearing, interrogation or examination." 65 ILCS 5/10-1-18.1 (West 2020).

¶ 54    Mondragon has not persuaded this court that her statutory right to counsel rises to the level of assistance constitutionally guaranteed to criminal defendants. She neglects to develop any argument as to whether her statutory right to counsel of her choice implies a right to effective assistance equal to that guaranteed by the Sixth Amendment, and if implied, what standards are employed to gauge effectiveness or if that includes conflict-free counsel. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *cf. Br. M.*, 2021 IL 125969, ¶ 42 (noting that "the right to be represented by counsel" under the Juvenile Court Act implies a right to effective assistance); *People v. Cotto*, 2016 IL 119006, ¶ 30 (noting that a defendant is entitled only to "reasonable assistance" under the Post-Conviction Hearing Act). We note the right to the effective assistance of counsel has been applied to certain civil actions, such as cases involving the termination of parental rights under the Juvenile Court Act, but our research has not uncovered a similar application to cases before administrative agencies. See *Br. M.*, 2021 IL 125969, ¶¶ 41-44; see also *In re Carmody*, 274 Ill. App. 3d 46, 56-57 (1995), and cases cited therein. Indeed, Mondragon fails to even acknowledge the aforementioned distinctions between criminal and civil law in her opening brief. As Mondragon's appellate brief cites no legal authority to develop her conflicts claim other than criminal cases and the Sixth Amendment, we conclude she has forfeited her claim.[12] See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief"); *Peterson*, 2017 IL 120331, ¶ 115; *Republic Bancorp Company v. Beard*, 2018 IL App (2d) 170350, ¶ 22.

---

[12]Notably, Mondragon asks that we "reverse her conviction." She has no such judgment of guilt for a criminal offense in this case. See Black's Law Dictionary (11th ed. 2019) (defining conviction).

¶ 55    In her reply brief, Mondragon adds that regardless of the source, her right to conflict-free representation is so important that it is embodied in our Rules of Professional Conduct.[13] While it is true that conflicts arising from a lawyer's responsibility to a former client are generally governed by the Rules of Professional Conduct Rule 1.7 (eff. Jan. 1, 2010), the forum for resolving a claimed violation is the Attorney Registration and Disciplinary Commission, not this court. *People v. Peterson*, 2017 IL 120331, ¶ 113. Thus, Mondragon has not established that a violation of the Rules of Professional Conduct is grounds for automatic reversal.

¶ 56    Furthermore, Mondragon has not supported her conflict claim appropriately. While Mondragon identifies a number of ways in which her pre-hearing attorney's representation of Fontaine created a conflict, she does not once cite to the sizable record on appeal to support her factual assertions, thus violating Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (requiring the argument to contain a citation to the pages of the record relied on). Without record support, we cannot assume her allegations are true. See *Manning v. City of Chicago*, 407 Ill. App. 3d 849, 856 (2011) (noting, failure to cite the record results in forfeiture of argument on appeal). Mondragon also does not argue specific facts show a conflict as to Fahy, her hearing attorney, other than that he once represented Fontaine.

¶ 57    Finally, we reject Mondragon's contention that her waiver was inadequate and unknowing. While conflicts can arise from a lawyer's responsibility to a former client, clients may consent to representation notwithstanding a conflict. See Ill. S. Ct. Rules of Prof. Conduct Rule 1.7 (eff. Jan. 1, 2010), Comment 14. Here, the limited record shows that Mondragon was informed of a potential conflict as to her pre-hearing and hearing attorneys. Although there is no

---

[13]In her reply brief, for her conflicts argument, Mondragon relies on two termination-of-parental-rights cases, *In re Darius G.*, 406 Ill. App. 3d 727 (2010), and *In re S.G.*, 347 Ill. App. 3d 476 (2004), but fails to note that both were subsequently overruled in *Br. M.*, 2021 IL 125969, ¶ 53.

transcript of the meeting or exact communications, the record indicates she was admonished by non-conflicted counsel of the possible pitfalls of representation. At the very least, she was made aware of the general significance of the conflict. See also *People v. Olinger*, 112 Ill. 2d 324, 339-40 (1986) (finding disclosure of conflict sufficient to support waiver). The record indicates that Mondragon then knowingly waived the matter as to Fahy, her attorney representing her at the hearing, via a written executed letter. At the hearing, she confirmed she had seen the letter and it bore her signature. That letter was submitted to the Police Board and to Fahy. See *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 654 (2007) (noting, a party cannot complain of an error to which that party consented).

¶ 58    Mondragon contends her waiver was insufficient where the record does not contain the waiver letter. However, it is well-settled that the appellant bears the burden to present a sufficiently complete record, and this court will resolve any doubts that arise from an incomplete record against the appellant. *Foutch v. O'Bryant,* 99 Ill. 2d 389, 391-92 (1984). Instead, absent a sufficient record on appeal, "it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Id*. at 392; see also *Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 66 (1999) (noting, an appellant's arguments that depend on facts not contained in the record are not sustainable on appeal). Furthermore, Mondragon also contends that the Police Board abused its discretion by permitting her to be represented by conflicted counsel but does not cite any law in support or further develop the argument under this standard, thus also forfeiting it. See *id.*; see also *In re Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (noting that "bare contentions that fail to cite any authority do not merit consideration on appeal"). Accordingly, Mondragon's contention fails for the aforementioned reasons.

¶ 59    Last, we note that throughout her brief, Mondragon makes other underdeveloped arguments absent citation to legal authority and factual assertions that lack record support, thus violating appellate rules of practice. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Lopez*, 375 Ill. App. 3d at 638 n. 1. She also raises new arguments in her reply brief, but it is clear that "[p]oints not argued are forfeited and shall not be raised in the reply brief." See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented, and the appellate court is not a depository in which the appellant may dump the burden of argument and research. *First Mercury Ins. Co. v. Nationwide Sec. Services, Inc.*, 2016 IL App (1st) 143924, ¶ 21. It is not the job of this court to scour the record and make arguments for the appellants, as our docket is full and noncompliance with the supreme court rules does not help us resolve appeals expeditiously. *Id.* Thus, to the extent this order does not address certain arguments or issues, it is because they are not well-defined enough to merit further attention. See *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 (2007).

¶ 60    We have thoroughly reviewed the substantial record in this case, as well as the briefs. This is now the third tier of review Mondragon has received after the nine-member Police Board and the circuit court examined and ruled on her case. Like the circuit court, we believe the "decision below was correct and just."

¶ 61                                    CONCLUSION

¶ 62    For all the reasons stated, we affirm the circuit court's judgment affirming the Police Board's decision to discharge Mondragon.

¶ 62    Affirmed.